**PELTS & SKINS, L.L.C.,**

v.

**James JENKINS, Jr., Secretary of the Louisiana Department of Wildlife and Fisheries.**

**No. CIV.A.02–CV–384.**

United States District Court, M.D. Louisiana.

April 24, 2003.

483

from compelling the producers of mushrooms to pay for generic advertising to which they object, but allows the government to compel the producers of peaches to pay for such advertising. Resolution of this case requires the court to determine whether Louisiana alligator producers are more like mushroom producers than like peach producers. The answer to that riddle determines whether a Louisiana statute compelling farmers of alligators to fund generic advertising treads upon the First Amendment rights of plaintiff. For reasons that follow, this court ultimately concludes that the alligator resembles the mushroom more than the peach, and thus, that the First Amendment stands between alligator farmers and Louisiana's mandatory assessments to pay for a generic alligator advertising program.

## BACKGROUND

This matter came before the court on a motion for summary judgment by plaintiff, Pelts & Skins, L.L.C. ("Pelts & Skins"), for judgment in the form of a permanent injunction against defendant, James Jenkins, Jr., Secretary of the Louisiana Department of Wildlife and Fisheries ("DWF") (doc. 29). Defendant opposes the motion (doc. 36). Thereafter, the parties agreed that the February 7, 2003 hearing on plaintiff's motion would serve as a submission of the case on the merits (doc. 43). All evidence submitted in support of and in opposition to the motion for summary judgment, as well as all other exhibits filed at the hearing, have been received by stipulation of the parties on the merits of the case. After consideration of the law, evidence, and arguments of counsel, the court renders its findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a), as follows:

Alex J. Peragine, Jennifer A. Lee, Peragine & Neill, L.L.C., Covington, LA, for Plaintiff.

C. Berwick Duval, II, Stanwood R. Duval, Duval, Funderburk, Sundbery & Lovell, Houma, LA, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, District Judge.

## PROLOGUE

The Supreme Court has held that the Constitution prohibits the government

## FINDINGS OF FACT

1. Plaintiff's alligator farming operation is conditioned upon payment of certain

mandatory fees ("license fees" and "tag fees") to the DWF. These fees are deposited into both the Louisiana Fur and Alligator Public Education and Marketing Fund and the Louisiana Alligator Resource Fund. A portion of revenues from these funds is then used by the DWF, as recommended by the Alligator Advisory Council, to finance generic marketing of alligator products without differentiating any particular type, quality, or brand of alligator product.[1] For example, the DWF's public education and marketing programs are primarily carried out by Don Ashley and Christine Brewton. Ashley attends trade shows, implements and designs airport booths, and produces literature promoting alligator products. Brewton visits various fashion houses promoting Louisiana alligator products and has implemented various educational information materials setting forth the "marsh to market" program of alligator skins.

2. Plaintiff has its own internal system of grading quality. Its marketing strategy is based on communicating the quality and uniqueness of its branded alligator product. Plaintiff does the majority of its business in Europe.

3. Plaintiff is "vehemently"[2] opposed to the DWF's marketing message, even if, as the DWF argues, generic marketing does not dilute product image in the mind of the consumer and does not reduce producer profits by lowering prices.[3]

4. According to the DWF's expert, Charles C. Theriot, of the total alligator industry related revenues received in the fiscal year ending 2002, approximately 92% were credited to the Resource Fund and 6% to the Education and Marketing Fund. From 1997 to 2002, the total alligator-related generic advertising and marketing expenditures made by the DWF from the Resource Fund were: 1% in 1997, 15% in 1998; 16% in 1999; 20% in 2000; 16% in 2001; and 14% in 2002.

5. Mr. Theriot also calculates that if educational expenditures made by the DWF are included as part of the DWF's alligator-related generic advertising and marketing expenditures and are included with those expenditures, then the total alligator-related generic advertising and marketing expenditures as a percentage of the total revenues realized by the DWF were: 1% in 1997, 9% in 1998, 12% in 1999, 22% in 2000, 16% in 2001, and 21% in 2002.[4]

1. In its answer, defendant admits to plaintiff's statement in the complaint that "[t]he marketing efforts approved and authorized by DWF through Mr. Jenkins and thereby funded by the Alligator Marketing Fund and the Alligator Resource Fund are generic in the sense that they promote alligator products or Louisiana's alligator products in general, without differentiating any particular type, quality or brand of alligator products (hereafter, 'DWF's Generic Marketing')." Complaint for Injunctive Relief, ¶ 21.

2. It is not clear to the court that vehemence is of constitutional significance, but since plaintiff insists upon so describing its stance, let it be duly noted for the record that plaintiff not only objects, but "vehemently" objects to the message of state's advertising program.

3. Any weight placed by either plaintiff or defendant upon the effectiveness of the generic marketing is irrelevant. For First Amendment purposes, it is enough that plaintiff is opposed to the marketing message and that plaintiff is one of a small part of society that is compelled to pay the cost of such advertising.

4. The court is aware of plaintiff's argument that Mr. Theriot's report fails to specify the criteria used to determine whether a particular expenditure was for generic marketing and that the report does not account for ge-

6. Defendant argues in brief that licensing fees are the only sources of income for the Education and Marketing Fund and are *de minimis* compared to the tag fees that account for the majority of the Resource Fund. Defendant argues further that the percentage of the total income used for generic marketing and public education is less than 25% of the annual funds received and that approximately 75% is used for maintaining proper research habitat, law enforcement, and so on. First of all, plaintiff maintains that it exports in excess of 80,000 raw skins per year and pays annual tag fees in excess of $320,000. Moreover, Mr. Theriot's report maintains that the plaintiff's own alligator-related payments were approximately 22.6%, 25.4%, and 25.1% of the total alligator-related revenue realized by the DWF from all sources for the fiscal years ending 2000, 2001, and 2002, respectively. The fact that plaintiff was responsible for approximately one quarter of the DWF's alligator revenue undermines defendant's *de minimis* argument. To trample upon one's First Amendment rights "just a little bit" does not rectify the fact that those rights are being trampled upon.

7. The DWF controls and supervises all wildlife within the state, including fish, and is charged with management, protection, conservation, and replenishment of the wildlife and fish. The DWF also regulates the shipping of skins. La.R.S. 36:602(B).

8. The DWF has statutory authority to establish regulations and licensing procedures regarding the taking, possessing, and shipping of all alligators, raw alligator skins, and alligator parts. La.R.S. 56:251(A)(2)(a)(iii).

9. Pursuant to La.R.S. 56:253(C)(1), every resident alligator hunter or farmer or nonresident alligator hunter must attach a tag to any out-of-state shipment of alligators or alligator skins. The tag must be secured from the DWF and must bear a certain color and serial number. Before shipping alligator or raw alligator skins out of state, La.R.S. 56:253(C)(2)(a) requires resident alligator hunters and farmers and nonresident hunters to pay to the DWF an alligator shipping label fee for each alligator and an alligator hide tag fee for each raw skin. The alligator shipping label fee and the alligator hide tag fee may be no more than four dollars per alligator or skin.[5] No alligator part may be shipped out of state without having affixed a label bearing the DWF license number and other information to the shipment. La.R.S. 56:253(D).

10. Every resident alligator hunter must pay a $25 annual license fee to DWF before commencing business. La. R.S. 56:251(2)(a)(i). Payment of an additional $25 entitles a duly licensed resident alligator hunter to another license authorizing him to be accompanied by one resident assistant while hunting. La.R.S. 56:251(2)(a)(ii). Only bona fide residents may apply for a resident alligator hunter's license. La.R.S. 56:252(A).

---

neric marketing financed by the Education and Marketing Fund.

**5.** "[H]owever, the alligator shipping label fee and the alligator hide tag fee shall each be reduced in any fiscal year by rule or regulation of the commission in an equal amount equivalent to any amount of additional revenues received into the Louisiana Alligator Resource Fund from the state general fund or sources other than alligator-related fees established pursuant to this Title." La.R.S. 56:253(C)(2)(a). The state currently charges two dollars for each tag.

11. The Louisiana Alligator Resource Fund, intended to defray the cost of alligator programs, is established by La.R.S. 56:279. This Fund is maintained by revenues received by the state from tag fees imposed on alligator hunters, alligator farmers, alligator shipping label fees on the sale of alligators, and all revenues derived from any other alligator-regulated fees and from the severance tax on alligator skins provided for in La.R.S. 56:256. La.R.S. 56:279(C)(1).[6]

12. Pursuant to La.R.S. 56:279(B)(1)-(5), the Resource Fund's five specific goals are as follows:

(1) To provide salaries and financial support including associated indirect cost for the following positions, to provide a minimum of two full-time technical positions (biologists) and eight nontechnical positions such as computer operators, secretaries, and wildlife specialists existing within the fur and refuge division of the Louisiana Department of Wildlife and Fisheries.

(2) To assist with funding for law enforcement activities associated with the alligator farm industry when surplus funds are available and recommended by the Louisiana Fur and Alligator Council.

*(3) To assist with funding marketing programs recommended by the Louisiana Fur and Alligator Advisory Council[7] when surplus funds are available.*

(4) To actively fund research on all aspects involved with alligator conservation and to develop the techniques needed to enhance the commercial alligator industry.

(5) To assist in funding management of the alligator population through proper management, harvest, and farm facility management.

(Emphasis added).

13. The Louisiana Fur and Alligator Public Education and Marketing Fund is established by La.R.S. 56:266. This Fund is maintained by the $25 license fees imposed upon trappers and alligator hunters as required by La.R.S. 56:251.[8]

14. Pursuant to La.R.S. 56:266(B)(1)-(7), the Education and Marketing Fund's seven specific goals are as follows:

(1) To educate the public regarding the need for trapping as a sound wildlife management tool and regarding the logic of managing furbearing species and alligators as renewable resources.

(2) To identify the current consumers of Louisiana furs and alligator hides.

(3) To identify present and potential Louisiana fur and alligator marketing problems, obstacles, and related significant issues.

(4) To strengthen existing markets and develop new markets and marketing strategies for raw and finished Louisiana fur and alligator products.

*(5) To develop and implement an international advertising campaign to promote the utilization of raw and finished Louisiana fur and alligator products.*

(6) To examine, evaluate, and make recommendations concerning any aspect of the fur and alligator industry including habitat management, harvest, and marketing which will enhance the future of the industry and perpetuate the conservation of these species.

(7) To make specific recommendations to the secretary regarding the expenditures of monies from the Alligator Re-

---

6. In 2002, the tag fees comprised 79% of the Resource Fund total.

7. As established by La.R.S. 56:266(C).

8. Twenty dollars of each twenty-five dollar alligator hunting license sold goes to the Education and Marketing Fund. La.R.S. 56:266(D)(1).

source Fund including any annual surplus only as provided for in R.S. 56:279. (Emphasis added).

15. The Louisiana Fur and Alligator Advisory Council reviews and approves recommended procedures and programs to be funded from the Public Education and Marketing Fund and the Resource Fund, to ensure that fund revenues are expended for the Council's specific goals. La.R.S. 56:266(C).

16. Though Louisiana's statutory scheme is comprehensive and designed to protect a once-endangered species, the DWF is not statutorily authorized and has never attempted to regulate to whom alligator farmers may sell their skins, the manner in which farmers promote and market their skins, or the price at which farmers must sell their skins on the open market.[9]

## CONCLUSIONS OF LAW

### The Tax Injunction Act of 1937

1. Jurisdiction is based upon 28 U.S.C. § 1331. After consideration of the parties' post-hearing memoranda (docs. 44 and 45) regarding jurisdictional questions posed by the Tax Injunction Act, 28 U.S.C. § 1341, the court concludes that the Act does not bar this action. First, Pelts & Skins does not seek to enjoin the "collection" of any monies (that is, plaintiff does not seek to enjoin the DWF from assessing the fees), but rather, seeks only to enjoin the Secretary from funding generic marketing with

these fees. Second, the "fees" in question do not amount to "taxes" for purposes of the Act. *See Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Mississippi,* 143 F.3d 1006, 1011 (5th Cir.1998) ("[T]he classic tax sustains the essential flow of revenue to the government, while the classic fee is linked to some regulatory scheme. The classic tax is imposed by a state or municipal legislature, while the classic fee is imposed by an agency upon those it regulates. The classic tax is designed to provide a benefit for the entire community, while the classic fee is designed to raise money to help defray an agency's regulatory expenses." (footnotes omitted)); *Goetz v. Glickman,* 920 F.Supp. 1173, 1181 (D.Kan.1996), *aff'd,* 149 F.3d 1131 (10th Cir.1998) (noting that assessments under the Beef Promotion and Research Act were not direct taxes, since "[a] regulatory scheme will not constitute a tax unless the real purpose and effect of the statute and regulations promulgated thereunder is to raise revenues for the general support of the government." (citations omitted)).

2. Considering the foregoing, the mandated fees used for generic advertising are "contrary to the First Amendment principles set forth in cases involving expression by groups which include persons who object to the speech, but who, nevertheless, must remain members of the group by law or necessity." *United States v. United Foods, Inc.,* 533 U.S. 405, 413, 121 S.Ct. 2334, 2339, 150 L.Ed.2d 438 (2001).

9. The defendant places much weight on the alligator's former status as endangered, maintaining that if left unregulated, alligators threaten to recess back into endangerment. While state regulations may have had a hand in alligator regeneration, that is not reason enough to save a statute that stands in violation of the First Amendment. This is especially true when the maintenance of the alligator population could easily be achieved without generic advertising or when generic advertising could be funded through general, independent sources.

## Government Speech

■ 3. The DWF contends that the speech espoused through the generic advertising and public education programs is government speech since the state maintains a degree of editorial control, is the literal speaker, and is ultimately responsible for the speech. The defendant cites several cases in furtherance of its strong contention.[10]

4. The essence of government speech is when the government speaks in favor of a public policy. *See, e.g., Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (the federal government is free to determine how appropriated general tax money could be used—"the government may 'make a value judgment favoring childbirth over abortion, and ... implement that judgment by the allocation of public funds.'" *Id.* at 192–193, 111 S.Ct. 1759).[11]

5. In *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), teachers sought a declaration that the "agency shop" clause of the collective bargaining agreement was invalid. The Court held, in part, that though the clause was valid insofar as it financed collective bargaining, contract administration, and grievance adjustments, First Amendment principles prohibited the union and the Board of Education from requiring any teacher to contribute (as a condition of employment as a public school teacher) to the support of an ideological cause he might oppose. In his concurrence, Justice Powell reasoned that a union is not representative of the people, but rather, is representative only of one segment of the population with certain common interests. *Abood,* 431 U.S. at 259 n. 13, 97 S.Ct. 1782.

6. When attorneys challenged the use of compulsory state bar association dues to finance ideological or political activities with which members disagreed, the Court in *Keller v. State Bar of California,* 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990) held that the use of the dues in this manner violated the attorneys' First Amendment right of free speech when such expenditures were not necessarily or reasonably incurred for the purposes of regulating the legal profession or improving the quality of legal services. In so finding, the Court reasoned that the bar was different from a traditional governmental agency because it was not created to participate in state government; therefore, the bar was subject to similar constitutional rules as was, for example, *Abood's* labor union. *Id.* at 13, 110 S.Ct. 2228.[12]

10. *Bd. of Regents of the Univ. of Wisconsin Sys. v. Southworth,* 529 U.S. 217, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000); *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *Sons of Confederate Veterans, Inc. v. Comm'r of the Virginia Dep't of Motor Vehicles,* 288 F.3d 610 (4th Cir.2002); and *Downs v. Los Angeles Unified Sch. Dist.,* 228 F.3d 1003 (9th Cir.2000), *cert. denied,* 532 U.S. 994, 121 S.Ct. 1653, 149 L.Ed.2d 636 (2001).

11. Neither of the two main cases at issue, *Glickman v. Wileman Bros. & Elliott, Inc.,* 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997) nor *United Foods,* 533 U.S. 405, 121 S.Ct. 2334, 150 L.Ed.2d 438, address the issue of government speech. *See Glickman,* 521 U.S. at 483 n. 2, 117 S.Ct. 2130; *United Foods,* 533 U.S. at 416, 121 S.Ct. 2334.

12. See *United States v. Frame,* 885 F.2d 1119 (3rd Cir.1989), *cert. denied,* 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1070 (1990), where the United States sought to recover assessments under the Beef Promotion and Research Act from a cattle buyer and produc-

7. When considering the constitutionality of a beef program funded by mandatory producer and importer contributions, one district court combined the above-referenced concepts from both *Abood* and *Keller* and concluded that the Beef Board was more akin to groups whose members are representative of one segment of the population (like *Abood's* labor union or *Keller's* state bar association), and thus, that the generic advertising scheme of the Board was not government speech. *Livestock Marketing Ass'n,* 207 F.Supp.2d at 1004.[13]

8. Several cases have considered the degree of the government's involvement in the workings of whatever Board or Council manages mandatory assessments.[14] These cases generally maintain that the greater the degree of involvement, the greater chance that the government speech doctrine will be invoked. Here, however, while the Secretary does appoint nine of the Alligator Council's eleven members, he himself does not sit on the Council. Moreover, those he appoints do not represent him; rather, the statute requires that they represent a cross section of alligator trappers, hunters, farmers, and coastal landowners from across the state. La.R.S. 56:266(C).

9. The Alligator Advisory Council is responsible for reviewing and approving recommended procedures and programs to be funded from the Resource Fund and the Education and Marketing Fund to ensure that the revenues from the two funds are spent for the

---

er. Despite finding that the Cattlemen's Board or the Operating Committee speaks on behalf of the Secretary and the government, the court found that the compelled expressive activities through assessments on cattle producers were not government speech, and, therefore, did implicate the First Amendment rights of those obligated to participate. The court reasoned that when general tax money is used to fund expressive activities, the "nexus" between the taxpayer and the message is attenuated. On the other hand, when a identifiable group's contributions fund a particular message associated with that group, then the government acts coercively. *Id.* at 1132. Though the court found no government speech, the ultimate conclusion was to sustain the Act's constitutionality based on the importance of the governmental interests. *Frame's* ultimate conclusion is not damaging to this ruling since the case is being used only for its government speech analysis (*United Foods* did not discuss it), that is, to determine whether the First Amendment is even implicated. It is not being used for its analysis of whether the First Amendment was indeed infringed upon—that determination has been undercut by the intervening logic of *United Foods. See Michigan Pork Producers v. Campaign for Family Farms,* 229 F.Supp.2d 772, 789 (W.D.Mich. 2002) (citing the 2001 *United Foods* decision as the justification for the differing ultimate conclusions in the 1989 *Frame* and 2002 *Livestock Marketing Ass'n v. United States Department of Agriculture,* 207 F.Supp.2d 992 (D.S.D.2002) decisions, both of which considered the constitutionality of the Beef Promotion and Research Act).

13. *Livestock* also relied on *Frame,* noting that the Board's speech was not funded by general tax revenues, but rather, by mandatory contributions from cattle producers, importers, and others who sell cattle. This was found to be an extremely narrow segment of society and one that was not representative of the population in general. Reliance upon *Frame* in this manner was also employed by *Michigan Pork Producers,* 229 F.Supp.2d 772, where the court found that mandated assessments for generic pork advertising used to support certain educational and research programs was not government speech and ultimately, that the payments violated the objecting hog farmers' First Amendment rights. The court noted that while *United Foods* did not address government speech, the issue had been addressed by *Frame* in a context similar to the on in *Michigan Pork. Id.* at 787.

14. *See Frame,* 885 F.2d 1119; *Livestock,* 207 F.Supp.2d 992; *Michigan Pork Producers,* 229 F.Supp.2d 772.

specific goals of the Council. The Resource Fund is sustained not through general tax dollars, but through mandatory tag fee revenues and the Education and Marketing Fund is sustained through mandatory licensing fee revenues. These fees are paid by alligator trappers, farmers, and hunters who, like *Abood's* union, can easily be considered a narrow segment of society with common interests and one not representative of the general population.[15] As with the state bar association in *Keller*, there is no evidence that the Alligator Advisory Council was created to participate in the state's general government. And as in *Frame*, the nexus between the trappers and hunters' mandatory fees and the Council's particular message cannot rightfully be characterized as attenuated. There is a close nexus between the alligator producers and the message funded.

10. Because the generic advertising here involved is not government speech, plaintiff is free to challenge such advertising on First Amendment grounds.

## First Amendment Claim

11. Constitutional determinations of the alligator marketing program are guided by the Supreme Court's 1997 *Glickman* decision and its 2001 *United Foods* decision. The regulatory scheme in this case more nearly resembles the one considered in *United Foods* rather than the one in *Glickman*.[16] Therefore, because Supreme Court precedent so requires, the DWF's generic advertising, as funded by the Resource Fund and the Education and Marketing Fund through mandatory assessments, amounts to unconstitutional compelled commercial speech. Explanation of why this is so requires a detailed consideration of that precedent.

12. In *Glickman*, the Court held that First Amendment protections were not abridged by various regulations contained in marketing orders promulgated by the Secretary of Agriculture (under the Agricultural Marketing Agreement Act of 1937) requiring California peach growers, handlers, and processors to pay assessments, from which were paid the cost of generic advertising of California peaches. Though the marketing orders regulated prices and surplus along with the quality, quantity, grade, and size of the commodity, they did not restrain producers from communicating any message to any audience, did not compel engagement in any actual or symbolic speech, and did not compel producers to endorse or to finance any political or ideological views. *Id.* at 469–470, 121 S.Ct. 2334.[17] Nevertheless, the Court

---

**15.** The fact that license fees paid by fur (as opposed to alligator) trappers end up in the Education and Marketing Fund does not defeat this reasoning. La.R.S. 56:251; La.R.S. 56:266(D)(1).

**16.** "The distinction between *Glickman* and *United Foods* does not turn on evaluation of the merits of competing policy concerns." *Delano Farms Co. v. California Table Grape Comm'n*, 318 F.3d 895, 899 (9th Cir.2003). Entitlement to First Amendment protection against state compulsion to fund generic advertising is governed by the challenged statute's similarity to either the one at issue in *Glickman* or to the one at issue in *United Foods*. If more similar to the latter, then the statute is in violation of First Amendment protections. *Id.* at 899–900.

**17.** The weight placed by the *Glickman* upon respondents' presumed agreement with the advertising message is notable: "since all of the respondents are engaged in the business of marketing California nectarines, plums, and peaches, it is fair to presume that they

placed great weight upon the statutory context and its displacement (through the marketing orders) of competition and many aspects of independent business activity characterized by antitrust protection; indeed, the orders were expressly exempted from the antitrust laws. The Court specifically noted that "[t]he business entities that are compelled to fund the generic advertising at issue in this litigation do so as part of a broader collective enterprise in which their freedom to act independently is already constrained by the regulatory scheme." *Glickman*, 521 U.S. at 469, 117 S.Ct. 2130.

13. *United Foods* held that the First Amendment prohibits the government from compelling mushroom farmers to pay assessments that were used largely to fund advertisements promoting mushroom sales pursuant to the Mushroom Promotion, Research, and Consumer Information Act. Though the advertising message was that mushrooms are worth consuming whether or not they are branded, a mushroom producer objected to being charged for a message that seemed to be favored by a majority of producers, wanting instead to convey the message that its brand of mushrooms was superior to those grown by other producers. Minor as it may have seemed, the Court found this disagreement to be significant enough to subject the compelled funding to First Amendment scrutiny. *United Foods*, 533 U.S. at 411, 121 S.Ct. 2334. When

such scrutiny revealed a violation, the Court distinguished *Glickman* on the ground that its program was fundamentally different from the one in *United Foods* in that *Glickman's* mandated assessments were ancillary to a more comprehensive program restricting market autonomy. *Id.* "Beyond the collection and disbursement of advertising funds, *there are no marketing orders that regulate how mushrooms may be produced and sold, no exemption from the antitrust laws, and nothing preventing the individual producers from making their own marketing decisions." Id.* at 412, 121 S.Ct. 2334 (emphasis added).

14. Certain commentary enunciated in *United Foods* bears repeating:

Just as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views, or from compelling certain individuals to pay subsidies for speech to which they object. Our precedents concerning compelled contributions to speech provide the beginning point for our analysis. The fact that the speech is in aid of a commercial purpose does not deprive respondent of all First Amendment protection.... The subject matter of the speech may be of interest to but a small segment of the population; yet those whose business and livelihood depend in some way upon the product involved no doubt deem First Amendment protection to be just as important for them as it is for other discrete, little noticed groups in a society which values the

---

agree with the central message of the speech that is generated by the generic program." *Glickman*, 521 U.S. at 470, 117 S.Ct. 2130. The Court also seemed to assume that the generic advertising was "factually accurate."

*Id.* at 474, 117 S.Ct. 2130. Here, plaintiff does not agree with the advertising message for an essentially unregulated market of alligator parts and skins.

freedom resulting from speech in all its diverse parts. First Amendment concerns apply here because of the requirement that producers subsidize speech with which they disagree.[18]

*United Foods,* 533 U.S. at 410–411, 121 S.Ct. 2334 (citations omitted). *See also Livestock,* 207 F.Supp.2d at 997–998 ("Like the plaintiffs in *Abood* and *Keller,* the plaintiff cattle producers are compelled to associate. They are required by federal law ... to pay 'dues,' if you will, to an entity created by federal statute ... Compelling plaintiffs to make contributions for speech to which they object works an infringement of their constitutional rights").

15. Subsequent to *United Foods,* the Ninth Circuit in January 2003 rendered an opinion that is entirely consistent with this ruling. The court held that assessments imposed on grape producers pursuant to California's Ketchum Act to fund generic advertising violated the First Amendment, reasoning that the assessments were not ancillary to a more comprehensive program that collectivized the industry or imposed an antitrust exemption, and that the advertising itself was the Act's primary object. *Delano Farms Co.,* 318 F.3d 895. Worth noting is the court's recognition that "[c]onstitutional law classes will doubtless enjoy the superficially droll question, 'why does the Constitution prohibit the government from compelling mushroom growers, but allow government to compel necta-

rine, peach and plum growers, to pay for generic advertising?'" *Id.* at 898.

16. The Louisiana statutory scheme at issue here is different from *Glickman* in a number of ways. Though the Alligator Advisory Council does collect and disburse advertising funds, defendant has not directed the court's attention to any provision suggesting that the statutory scheme displaces competition. The alligator market remains competitive. Indeed, nothing prevents the individual farmers or trappers from making their own marketing, advertising, and branding decisions.[19] Alligator farmers determine their own standards of quality, and they freely negotiate prices with their customers. The court, therefore, cannot characterize the statutory scheme as a "broad collective enterprise" which constrains an alligator producer's freedom to act. Similarly, the statutory scheme cannot be characterized as one of economic regulation such that mandated participation in an advertising program may be viewed merely as one of any number of cooperative acts or forced association. The alligator industry is also not exempt from the antitrust law of the United States. In short, the Louisiana alligator industry, while regulated, is not *heavily* regulated (at least not as heavily regulated as the peach industry in *Glickman* ).

---

**18.** As noted *supra,* n. 2, plaintiff alligator farmer not only "objects" to the generic speech, plaintiff *vehemently* objects.

**19.** The DWF asserts in its proposed findings of fact that, as a general matter, "Louisiana's statutory scheme (La.R.S. 56:251 *et seq.*) governs the taking of alligators, provides for licenses, defines who may apply for a license, and regulates the tagging, shipping and label-

ing of alligator hides. Moreover, the scheme provides for the season for taking alligators and provides for scientific research into the life habits of alligators through technically trained officers and employees." Proposed Findings of Fact and Conclusions of Law, ¶ 8. Nowhere is it claimed that the statutory scheme displaces competition or otherwise prevents alligator farmers from making their own marketing decisions.

17. Pursuant to the Act at issue in *United Foods*, the Mushroom Council (recipient of the challenged assessment), was authorized to "enter into contracts or agreements for the implementation and carrying out of plans or projects of mushroom promotion, research, consumer information, or industry information, including contracts with producer organizations" and to pay for the associate costs with the assessments. 7 U.S.C. § 6104(e)(1). As overseer of Public Education and Marketing and Resource Fund revenues, the Alligator Advisory Council's responsibilities are highly similar, especially in light of the enumerated goals of each Fund. La.R.S. 56:266(C); La.R.S. 56:266(B)(1)-(7); La.R.S. 56:279(B)(1)-(5).

18. The advertising at issue here is not ancillary to a more comprehensive program restricting market autonomy which the Court considered to be significant in *United Foods*. As noted *supra*, the DWF is not statutorily authorized to regulate to whom alligator farmers may sell their skins, the manner in which farmers promote and market their skins, or the price at which farmers must sell their skins. Insofar as *United Foods* was concerned with the percentages of assessment money used for generic advertising, it is notable that the jurisprudence does not mandate the presence of hard and fast percentage of total DWF revenue spent on generic advertising. In *Delano Farms*, for example, the court held that in light of *United Foods*, the advertising assessments mandated under state law violated the First Amendment rights of grape producers. In addition to being based upon the lack of either industry collectivization or an antitrust exemption, the court's holding was also based in part on the fact that about 90% of the assessment money was spent on generic promotional activities. In *Livestock*, 50% of the assessments collected and paid to the Beef Board were used for advertising, in *Michigan Pork*, roughly half of the Pork Board's budget went to advertising, marketing, and merchandising, and in *Charter v. United States Department of Agriculture*, 230 F.Supp.2d 1121 (D.Mont. 2002), a "great percentage" of the assessments were used for generic advertising. These cases do not suggest that lower percentages of generic advertising spending will negate the applicability of *United Foods*. Here, the percentages of total revenue spent on alligator-related generic advertising and marketing by the DWF from the Resource Fund are not so paltry as to render *United Foods* inapplicable, especially since the percentages have risen significantly in recent years. The presence of less than average percentages in this case is overcome by the fact that there is no collectivization of the industry and that no antitrust exemption exists. And again, as stated earlier, to trample upon plaintiff's First Amendment rights "just a little bit" does not rectify the fact that those rights are being trampled upon.

19. The Louisiana statutory scheme provides funding from the mandatory assessments upon plaintiff for many useful and productive activities to which plaintiff could not (and does not) object on First Amendment grounds. These activities include law enforcement, research and development of alligator habitat and protection and management of the species—all of which have no doubt contributed to rescuing the alligator from its

once near-extinct status. The state's compelled generic advertising program, however, is completely severable from those conservation activities.

20. Plaintiff does not demand a refund of that portion of its prior assessments which have been spent on such generic advertising nor does plaintiff request that assessment and collection of either the tag or license fee be restrained. Plaintiff demands as relief only that the Secretary of the Louisiana Department of Wildlife and Fisheries be enjoined from "approving, authorizing or expending any money from the Alligator Resource Fund or the Alligator Marketing Fund for the purpose of generic alligator marketing." That relief is available, however, only if the statutory program authorizes the Secretary to continue to collect the assessments and spend them for purposes other than such advertising. The court assumes that both sides agree that the Secretary has such authority. If that assumption is not correct then counsel for plaintiff shall propose a different remedy.

## EPILOGUE

The First Amendment provides, in part: "Congress [20] shall make no law ... abridging the freedom of speech ..."

The undersigned admits to a certain degree of difficulty in maintaining an appropriately straight judicial face while attempting to apply the Supreme Court precepts that explain the simple language of the First Amendment, to the alligator advertising program at issue here.

When important constitutional issues must be resolved by a determination of whether an alligator is more like a mushroom than a peach, then in the words of Justice Thomas: "[S]urely we have lost our way." *Glickman,* 521 U.S. at 506, 117 S.Ct. 2130 (Thomas, J., dissenting).

## CONCLUSION

Accordingly, judgment shall be entered in favor of plaintiff, Pelts & Skins, L.L.C., and against defendant, Secretary of the Louisiana Department of Wildlife and Fisheries and all others covered by Fed. R.Civ.P. Rule 65(d) permanently enjoining them from future approving, authorizing or expending revenues from the Louisiana Fur and Alligator Public Education and Marketing Fund or from the Louisiana Alligator Resource Fund for the purpose of generic alligator marketing. Counsel for plaintiff shall confer with counsel for defendant and submit a proposed effective date for such an injunction, along with a proposed form of judgment.

---

**20.** It is well established the First Amendment applies to the states as well.