SUMMIT MEDICAL CENTER OF ALABAMA, INC., New Women's Health Care; Beacon Women's Center; on behalf of themselves and their patients seeking abortions, Plaintiffs,

v.

Bob RILEY, in his official capacity as Governor for the State of Alabama and his agents and successors; Bill Pryor, in his official capacity as Attorney General for the State of Alabama and his agents and successors; Donald Williamson, M.D., in his official capacity as State Health Officer for the Alabama Department of Public Health and his agents and successors; and Ellen Brooks, in her official capacity as Montgomery District Attorney, Defendants.

No. CIV.A. 02–A–1064–N.

United States District Court,
M.D. Alabama,
Northern Division.

Sept. 15, 2003.

M. Wayne Sabel, Sabel & Sabel, P.C., Montgomery, AL, David A. Gespass, Gespass & Johnson, Birmingham, AL, Linda A. Rosenthal, Angela Hooton, Center for Reproductive Rights, New York City, for plaintiffs.

William H. Pryor, Jr., Attorney General, Charles B. Campbell, Office of the Attorney General, Montgomery, AL, A. Eric Johnston, Birmingham, AL, Patricia E. Ivie, John R. Wible, Alabama Department of Public Health, William D. Dill, Office of the Attorney General, Troy R. King, Office of the Governor, Montgomery, AL, for defendants.

### MEMORANDUM OPINION AND ORDER

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This cause is before the court on a Motion to Alter or Amend Order on Summary Judgment filed by the Defendants on August 8, 2003 (Doc. # 100).

On July 23, 2003, the court issued a Memorandum Opinion and Order (Doc. # 99) in which, *inter alia,* the court granted partial summary judgment in favor of the Plaintiffs, concluding that the last sentence of Alabama Code section 26–23A–5(c) violates the First Amendment to the United States Constitution to the extent that it may be applied to providers of abortions. *See Summit Medical Center of Alabama, Inc. v. Riley,* 274 F.Supp.2d 1262, 1283 (M.D.Ala.2003). Pursuant to Federal Rule of Civil Procedure 59(e), the Defendants have filed a motion requesting that the court reconsider its decision.

### II. MOTION TO RECONSIDER STANDARD

District courts are necessarily afforded substantial discretion in ruling on motions for reconsideration. *Mincey v. Head,* 206 F.3d 1106, 1137 (11th Cir.2000) ("The decision whether to alter or amend a judgment pursuant to Rule 59(e) is committed to the sound discretion of the district judge.") (internal quotations omitted). "Because litigants cannot be repeatedly called upon to backtrack through the paths of litigation, reconsideration of a previous order is an extraordinary remedy to be

employed sparingly." *Groover v. Michelin N. Am., Inc.,* 90 F.Supp.2d 1236, 1256 (M.D.Ala.2000) (internal quotations omitted). Accordingly, "[m]otions to amend should not be used to raise arguments which could, and should, have been made before the judgment was issued." *O'Neal v. Kennamer,* 958 F.2d 1044, 1047 (11th Cir.1992); *see Am. Home Assurance Co. v. Glenn Estess & Assocs., Inc.,* 763 F.2d 1237, 1239 (11th Cir.1985) ("There is a significant difference between pointing out errors in a court's decision on grounds that have already been urged before the court and raising altogether new arguments on a motion to amend; if accepted, the latter essentially affords a litigant 'two bites at the apple.'"). Instead, courts have recognized three grounds justifying reconsideration: 1) an intervening change in controlling law; 2) the availability of new evidence; and 3) the need to correct clear error or manifest injustice. *See Groover,* 90 F.Supp.2d at 1256.

### III. *FACTS AND PROCEDURAL HISTORY*

The State of Alabama adopted The Woman's Right to Know Act ("Act") on April 17, 2002. *See Ala. Code* §§ 26–23A–1 to 13. Its purpose is "to ensure that every woman considering an abortion receives complete information on the procedure, risks, and her alternatives." *Id.* at § 26–23A–2(b). Among other things, the Act requires the Alabama Department of Public Health ("ADPH") to create an informational brochure containing the following information:

(1) Geographically indexed printed materials designed to inform the woman of public and private agencies and services available to provide medical and financial assistance to a woman through pregnancy, prenatal care, upon childbirth, and while her child is dependent. The materials shall include a comprehensive list of the agencies, a description of the services offered, and the telephone numbers and addresses of the agencies.

(2) The printed materials shall include a list of adoption agencies geographically indexed and that the law permits adoptive parents to pay the cost of prenatal care, childbirth and neonatal care.

(3) Printed materials that inform the pregnant woman of the probable anatomical and physiological characteristics of the unborn child at two-week gestational increments from fertilization to full term. It shall include color photographs of the developing child at each of the two-week gestational increments, a clear description of the unborn child's development, any relevant information on the possibility of the unborn child's survival, and dimensions of the unborn child. The materials shall be realistic, clear, objective, non-judgmental, and designed to convey only accurate scientific information about the unborn child at the various gestational ages.

(4) The materials shall contain objective information describing the methods of abortion procedures commonly employed and the medical risks of each, and the medical risks associated with carrying a child to term.

(5) The printed materials shall list the support obligations of the father of a child who is born alive.

(6) The printed materials shall state that it is unlawful for any individual to coerce a woman to undergo an abortion, that any physician who performs an abortion upon a woman without her informed consent may be liable to her for damages in a civil action at law.

(7) The material shall include the following statement: "There are many public and private agencies willing and able to help you to carry your child to term, and to assist you and your child after your child is born, whether you choose to

keep your child or place him or her for adoption. The State of Alabama strongly urges you to contact those agencies before making a final decision about abortion. The law requires that your physician or his or her agent give you the opportunity to call agencies like these before you undergo an abortion." *Id.* at § 26–23A–5(a). These materials "shall be in a bound booklet, shall contain large clear photographs, and shall be printed in a typeface large enough to be clearly legible." *Id.* at § 26–23A–5(b). Under the Act, a physician or qualified person[1] must provide a copy of the information booklet to a woman seeking an abortion at least 24 hours prior to the abortion procedure. *Id.* at § 26–23A–4(a).

In addition to the information booklet, the Act requires ADPH to create a video tape detailing much of the information in the printed materials as well as a consent form in order for the patient to verify that she gives informed consent pursuant to the Act. *Id.* at §§ 26–23A–(6)(a), (c). Unlike the mandatory printed materials, however, the Act does not require patients to view the video tape if they do not want to do so. *See id.* §§ 26–23A–4(b)(5), 4(d) (stating that a woman gives informed consent if she acknowledges on the consent form that she had the opportunity to view the video tape).

The Act states that ADPH "may charge a reasonable fee based on the cost of producing the materials and video tape." *Id.* at § 26–23A–(5)(c). According to a letter dated September 18, 2002, ADPH informed the Plaintiffs that the printed information packages may be purchased at a cost of $4.00 each, plus $6.00 shipping and handling. *See* Memorandum in Support of Plaintiffs' Motion for Summary Judgment (Doc. # 70), Exhibit B. As a service to

large volume consumers, however, ADPH stated that it will waive the shipping and handling fees on orders that are received between certain specified dates each year. *Id.* ADPH also expressed its intent to charge the Plaintiffs $50 for each copy of the video tape. *Id.*

In their Amended Class Action Complaint, the Plaintiffs' Tenth Claim alleged that the Act's compelled distribution and payment provisions violate the First Amendment because they force abortion providers "to pay money for mandatory speech they do not wish to endorse let alone purchase." Amended Class Action Complaint, ¶ 99. Both the Plaintiffs and Defendants filed cross motions for summary judgment on this claim (Docs. # 69 & 71). After considering the arguments presented, the court granted each party's motion in part. With respect to the compelled distribution provision of the Act, § 26–23A–4(a), the court granted summary judgment in favor of the Defendants, concluding that this section does not run afoul of the First Amendment. *See Riley*, 274 F.Supp.2d at 1283. As to the Act's compelled payment provision, § 26–23A–5(c), the court granted summary judgment in favor of the Plaintiffs, concluding that this section violates the First Amendment. *Id.*

### IV. *DISCUSSION*

The Defendants' Motion to Alter or Amend Order on Summary Judgment is directed toward the court's conclusion that the Act's compelled payment provision violates the First Amendment. In support of their motion, the Defendants assert two arguments. First, the Defendants contend that the court failed to view the Act's compelled payment provision within the context of the State's broader regulatory

---

**1.** The Act defines a "qualified person" as "[a]n agent of the physician who is a psychologist, licensed social worker, licensed profes-sional counselor, registered nurse, or physician." *Id.* at § 26–23A–3(9).

scheme for abortion. The Defendants conclude that by taking a narrow view of the Act's context, the court incorrectly applied *United States v. United Foods, Inc.*, 533 U.S. 405, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001). Second, the Defendants argue that the court failed to consider whether the State's informational materials are immune from First Amendment scrutiny under the "government speech" doctrine. Neither of these two arguments is properly asserted in a motion for reconsideration, except possibly to the extent that the first argument is simply that the court "got it wrong." *See Mays v. United States Postal Service*, 122 F.3d 43, 46 (11th Cir.1997) ("This circuit has held that a motion to reconsider should not be used by the parties to set forth new theories of law."). A motion to reconsider is only available when a party presents the court with evidence of an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or manifest injustice. *See Groover*, 90 F.Supp.2d at 1256. None of these criteria are present in this case; therefore, the court concludes that the Defendants' motion is due to be DENIED.

Even if the court were to consider the merits of the Defendants' arguments, the court would not alter or amend its decision. As to the Defendants' contention that the court failed to place the act within the context of the State's comprehensive abortion regulation scheme, this argument is unpersuasive given the Supreme Court's language in *United Foods*. In *United Foods*, the Court explained that "a threshold inquiry must be whether there is some state imposed obligation which makes group membership less than voluntary; for it is only the overriding associational purpose which allows any compelled subsidy for speech in the first place." *United Foods*, 533 U.S. at 413, 121 S.Ct. 2334. The Court upheld compelled subsidies for speech in *Abood v. Detroit Board of Edu-*

*cation*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), *Keller v. State Bar of California*, 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990), and *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997), due to the presence of state and federal regulations that required collective associations for broader regulatory purposes. In *Abood*, compelled association was present because the State of Michigan required all union and nonunion members to associate with each other under a union shop arrangement in order to further the "desired benefits of collective bargaining." *United Foods*, 533 U.S. at 413, 121 S.Ct. 2334. Similarly, in *Keller*, the State of California required all attorneys who wanted to practice law in that State to associate together into an integrated bar in order ensure that all lawyers would pay a fair share of the cost of regulating the legal profession and improving the quality of California's legal services. *See id.* Finally, in *Glickman*, Congress passed legislation that "mandated cooperation" among producers of California tree fruit in order to "maintain a stable market." *Id.* Because of the existence of laws requiring compelled associations in order to further broader public policy goals, the Supreme Court held that compelled contributions were permissible as long as they were "germane to the larger regulatory purpose that justified the association." *Id.*

Unlike the cases cited above, *United Foods* involved a situation in which the government required compelled association of mushroom handlers not for a broader regulatory purpose, but only to compel them to fund speech, specifically advertising that promoted mushroom sales. *See id.* at 415, 121 S.Ct. 2334. ("[T]here is no broader regulatory program in place here."). Stated differently, the statutory scheme in *United Foods* did not require mushroom handlers to associ-

ate together in order to advance a broader regulatory end; instead, the only collective action mushroom handlers had with each other was paying a fee to the government. *See id.* ("[H]ere the statute does not require group action, save to generate the very speech to which some handlers object."). Consequently, the Supreme Court held that the compelled assessments in *United Foods* violated the First Amendment. *Id.* at 416, 121 S.Ct. 2334.

■ Like the mushroom producers in *United Foods,* the Plaintiffs in this case are not forced to associate as a group in order to further a broader regulatory end. Even if the court viewed the Act and its compelled payment provision within the context of the State's comprehensive scheme of abortion regulation, the fact remains that the State's other abortion regulations do not require any collective association whatsoever. *See Ala.Code* §§ 26–21–1 to 8 (requiring parental or judicial consent in order for unemancipated minor to obtain an abortion); §§ 26–22–1 to 5 (criminalizing abortion of viable unborn child); *Ala. Admin. Code* §§ 420–5–1–.01 to .04 (regulations concerning the administration and physical environment of abortion facilities). In short, the "cooperative ... structure" present in *Abood, Keller,* and *Glickman* "finds no corollary here" due to the lack of a "state imposed obligation which makes group membership less than voluntary." *United Foods,* 533 U.S. at 413, 415, 121 S.Ct. 2334. Moreover, the expression the Plaintiffs are "required to support is not germane to a purpose related to an association independent from the speech itself." *Id.* Therefore, pursuant to *United Foods,* the Act's compelled payment provision violates the First Amendment.

With regard to the Defendants' "government speech" argument, the court notes that the Defendants never raised this argument in any of their briefs or during oral argument. Now, the Defendants have presented the court with a recent case from the Eastern District of California, *R.J. Reynolds Tobacco Co. v. Bonta,* 272 F.Supp.2d 1085 (E.D.Cal.2003), in which that court relied on the government speech doctrine in holding that the revenue generated from California's wholesale tax on tobacco sales could be used to fund anti-tobacco advertisements, notwithstanding the First Amendment objections of the dissenting taxpayers. Following *Bonta,* the Defendants argue that the State of Alabama may impose a direct fee on abortion providers and use the revenue to fund State-authored literature that prefers childbirth over abortion. As previously discussed, however, a motion for reconsideration is not the proper forum to assert new legal theories. Nevertheless, the court believes a brief discussion of the "government speech" doctrine is appropriate in order to distinguish this case from *Bonta.*

The government speech doctrine has been described by one federal court as follows:

> A government agency may use revenue, whether derived from taxes, dues, fees, tolls, tuition, donations, or other sources for any purposes within its authority. To effectively govern, it must take substantive positions and decide disputed issues. So long as it bases its actions on legitimate goals, the government may speak despite citizen disagreement with the content of the message. *Keller v. State Bar of Cal.,* 496 U.S. 1, 10, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990).

> The government is not required to be content-neutral. *Id.* "When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could es-

pouse some different or contrary position." *Board of Regents of the University of Wisconsin System v. Southworth*, 529 U.S. 217, 235, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000). The government may fund viewpoint-based speech when the government itself is the speaker. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001). It also may use private speakers to disseminate specific messages pertaining to government programs. *Id.; Rosenberger v. Rector and Visitors of the Univ. of Vir.*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

*Charter v. United States Dep't of Agric.*, 230 F.Supp.2d 1121, 1129 (D.Mont.2002); *See also Pelts & Skins, L.L.C. v. Jenkins*, 259 F.Supp.2d 482, 488–90 (M.D.La.2003) (discussing government speech doctrine); *In re Washington State Apple Adver. Comm'n*, 257 F.Supp.2d 1290, 1296 (E.D.Wash.2003) (same).[2] Recently, the United States Court of Appeals for the Eight Circuit recognized that "the government speech doctrine has firm roots in our system of jurisprudence." *Livestock Mktg. Ass'n v. United States Dep't of Agric.*, 335 F.3d 711, 719 (8th Cir.2003). Although the Supreme Court has yet to articulate a version of the government speech doctrine in the manner stated above, recent opinions provide a strong indication that the Court believes the doctrine exists. Nonetheless, the scope and extent of the doctrine are unsettled questions at the present time. *See Sons of Confederate Veterans, Inc., v. Comm'r of Va. Dep't of Motor Vehicles*, 305 F.3d 241, 245 (4th Cir.2002) (Luttig, J., respecting

the denial of rehearing en banc) ("[T]he 'government speech' doctrine is still in its formative stages, and, as yet, it is neither extensively nor finely developed."); *Wells v. City & County of Denver*, 257 F.3d 1132, 1140 (10th Cir.2001) ("The Supreme Court has provided very little guidance as to what constitutes government speech."). Accordingly, a review of the Court's opinions on government speech is necessary in order to understand the Court's position on this issue.

In *Keller*, the State Bar of California argued that its speech was "government speech," and "therefore entitled to the treatment accorded to a governor, mayor, or a state tax commission." *Keller*, 496 U.S. at 12, 110 S.Ct. 2228. Although the Court did not dismiss the merits of this argument out of hand, the Court explained that *Keller* did not present a case in which the doctrine could be applied because the "very specialized characteristics of the State Bar of California ... distinguish it from the role of the typical government official or agency." *Id.* at 12, 110 S.Ct. 2228. According to the Court:

> Government officials are expected as a part of the democratic process to represent and to espouse the views of a majority of their constituents. With countless advocates outside of the government seeking to influence its policy, it would be ironic if those charged with making governmental decisions were not free to speak for themselves in the process. If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to

---

**2.** Like *United Foods*, these case have generally arisen in the context of an agricultural or livestock "check off" program in which a state or federal statute authorizes the creation of a board that imposes fees on handlers of certain goods. The board then uses the money generated by these fees for promotion and advertising of the goods. *See, e.g., Jenkins*, 259 F.Supp.2d at 484 (explaining that the Louisiana Department of Wildlife and Fisheries imposes mandatory fees on all alligator farmers and then uses the money to finance generic advertising for alligator products).

the public would be limited to those in the private sector, and the process of government as we know it radically transformed. *Cf. United States v. Lee,* 455 U.S. 252, 260, 102 S.Ct. 1051, 1056, 71 L.Ed.2d 127 (1982) ("The tax system could not function if denominations were allowed to challenge the tax system because tax payments were spent in a manner that violates their religious belief").

The State Bar of California was created, not to participate in the general government of the State, but to provide specialized professional advice to those with the ultimate responsibility of governing the legal profession. Its members and officers are such not because they are citizens or voters, but because they are lawyers. We think that these differences between the State Bar, on the one hand, and traditional government agencies and officials, on the other hand, render unavailing respondent's argument that it is not subject to the same constitutional rule with respect to the use of compulsory dues as are labor unions representing public and private employees.

*Id.* at 12–13, 110 S.Ct. 2228; *see also Abood,* 431 U.S. at 259 n. 13, 97 S.Ct. 1782 (Powell, J., concurring) ("[T]he reason for permitting the government to compel the payment of taxes and to spend money on controversial projects is that the government is representative of the people. The same cannot be said of a union, which is representative only of one segment of the population, with certain common interests.").

Several years later, in *Board of Regents of the University of Wisconsin v. Southworth,* 529 U.S. 217, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000), the Court addressed a First Amendment compelled speech claim based upon the use of mandatory student activity fees to fund student organizations engaging in political or ideological speech.

Although not referring to the doctrine by name, the Court again declared that the case did not present the appropriate occasion to apply the principle of government speech: "The University having disclaimed that the speech is its own, we do not reach the question whether traditional political controls to ensure responsible government action would be sufficient to overcome First Amendment objections and to allow the challenged program under the principle that the government can speak for itself." *Id.* at 219, 120 S.Ct. 1346. Nevertheless, the Court hinted that it would be willing to apply a different constitutional analysis in the event the speech in question was attributable to the government: "Where the University speaks, either in its own name through its regents or officers, or in myriad other ways through its diverse faculties, the analysis likely would be altogether different." *Id.* at 235, 120 S.Ct. 1346. Building on the language in *Keller,* the Court then offered the following:

> When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position. In the instant case, the speech is not that of the University or its agents.

*Id.*

Finally, in *United Foods,* the government argued that the council's mushroom advertising was properly classified as "government speech," thus the government concluded that it was immune from the First Amendment scrutiny that would otherwise apply. *See United Foods,* 533 U.S. at 417, 121 S.Ct. 2334; *see also* Brief For the Petitioner (United States) at 32, 2001 WL 81601 ("The First Amendment does not constrain the government's ability

to engage in speech on its own, whether funded by general tax revenues or by 'user fees' imposed on those who benefit most from the speech."). The Court, however, refused to address the merits of this argument because the government did not raise it before the Court of Appeals. *See United Foods*, 533 U.S. at 417–18, 121 S.Ct. 2334.

After reviewing the Supreme Court's dicta on government speech, this court concludes that the State of Alabama is not required to be a content-neutral player in the marketplace of ideas. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 598, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (Scalia, J., concurring) ("It is the very business of government to favor and disfavor points of view on (in modern times, at least) innumerable subjects—which is the main reason we have decided to elect those who run the government."). Indeed, the State may express its views through a variety of means available to it. For example, the State may fund policies and programs that further its ideological preferences. *See, e.g., Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes."); *Rust v. Sullivan*, 500 U.S. 173, 192–200, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (holding that the federal government does not violate the First Amendment rights of abortion providers when the government chooses to fund family planning organizations that promote childbirth but does not fund similar family planning organizations that promote abortion). Conversely, the State may express its policy preferences through the imposition of taxes, assessments, fees, and other compelled contributions. *See Southworth*, 529 U.S. at 228, 120 S.Ct. 1346 ("The government, as a general rule, may support valid programs and policies by taxes or other

exactions binding on protesting parties."). When the State chooses to pursue its policies, either through funding one organization to the exclusion of another or assess fees upon a limited class of individuals, it is inevitable that these policies will be "contrary to the profound beliefs and sincere convictions of some of its citizens." *Id.* at 229, 120 S.Ct. 1346. Therefore, the question becomes how to resolve a conflict between the competing rights at stake. On the one hand, the State must have the right to engage in a variety of speech and policy mechanisms in order to further its goals. On the other hand, the First Amendment recognizes the right of citizens not to be compelled to adopt government speech which they find objectionable. *See Abood*, 431 U.S. at 235, 97 S.Ct. 1782. This court believes this answer lies in the text of the First Amendment.

■ The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." As evidenced from the text, the First Amendment acts as a prohibitive barrier to government infringement on the free speech rights of citizens. The First Amendment does not purport to bestow any superior free speech rights on the government. While the structural underpinnings of democracy certainly permit the government to engage in speech to advance its policies, the First Amendment does not provide the government with wholesale immunity from infringing on the rights of citizens when it chooses to speak. In fact, the First Amendment does just the opposite, it prevents the government from using its power to restrict the free speech rights of private citizens. Given this textual structure, the court believes that the government speech doctrine cannot serve as a shield against all First Amendment challenges. *See Livestock Mktg.*, 335 F.3d at 720 ("[T]he government speech doctrine clearly does

not provide immunity for all types of First Amendment claims."). Therefore, when the government's speech interferes with the free speech rights of private citizens, the proper approach is to balance the government's interest against the competing First Amendment rights of private citizens. *Id.* at 721. ("In compelled speech cases, the Supreme Court has traditionally applied a balancing-of-interests test to determine whether or not the challenged governmental action is justified."); *see Wooley v. Maynard,* 430 U.S. 705, 715–17, 97 S.Ct. 1428, 51 L.Ed.2d 752 (applying a balancing test to determine if the government's interest outweighed the infringement on the plaintiffs' First Amendment rights).

█ In this case, the State has interfered with the Plaintiffs' free speech rights by compelling them to contribute money that is subsequently used to fund government speech that the Plaintiffs find objectionable. *See Abood,* 431 U.S. at 235, 97 S.Ct. 1782 ("The fact that the appellants are compelled to make, rather than prohibited from making, contributions for political purposes works no less an infringement on their constitutional rights.");[3] *Livestock Mktg.,* 335 F.3d at 720 (holding that compelled contributions that fund government speech constitute "a form of 'government interference with private speech' "). As a result of this intrusion, the court must determine whether the State's interest is "sufficiently compelling" to justify the Act's payment provision. *Wooley,* 430 U.S. at 716, 97 S.Ct. 1428. This analysis requires inquiry into two separate but related areas. First, what is the degree of the State's intrusion on the Plaintiffs' free speech rights? Second, what is the State interest that justifies compelling the Plain-

tiffs to pay for the State's information materials?

With regard to the degree of the State's intrusion, the court believes it is relevant to consider the "coerced nexus between the individual and the specific expressive activity." *United States v. Frame,* 885 F.2d 1119, 1132 (3d Cir.1989). For example, "[w]hen the government allocates money from the general tax fund to controversial projects or expressive activities, the nexus between the message and the individual is attenuated." *Id.* When this nexus is attenuated, the intrusion upon the First Amendment rights of private individuals is insignificant because the persons paying the money are not closely associated with the message advanced by the government. *Southworth,* 529 U.S. at 240, 120 S.Ct. 1346 (Souter, J., concurring) (recognizing that the degree of the "connection between the fee payor and offensive speech ... loomed large in our decisions in the union and bar cases"); *Lathrop v. Donohue,* 367 U.S. 820, 860, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961) (Harlan, J., concurring) (requiring a person to pay mandatory dues to the general fund of a state bar association does not identify the payor with the views expressed by that organization). "In contrast, where the government requires a publicly identified group to contribute to a fund earmarked for the dissemination of a particular message associated with that group, the government has directly focused its coercive power for expressive purposes." *Frame,* 885 F.2d at 1132. The present case falls into the latter of these two situations, as the State is imposing a direct fee assessment on a limited class of citizens—abortion providers—and using the revenue to advance speech in support of the State's

---

**3.** The Court also quoted Thomas Jefferson: "to compel a man to furnish contributions of money for the propagation of opinions which

he disbelieves, is sinful and tyrannical." *Abood,* 431 U.S. at 235 n. 31, 97 S.Ct. 1782 (internal quotations and citations omitted).

favored policy positions on abortion. Because the relationship between the fee payor and the government's expression is much more direct in this case, it follows that the degree of intrusion on the Plaintiffs' First Amendment rights is more significant as well.[4]

■ *Bonta,* the case principally relied upon by the Defendants, does not account for the considerable intrusion on First Amendment rights that results from a direct fee assessment as opposed to a more generalized tax. The *Bonta* court took the position that the method of funding government speech is irrelevant to the constitutional inquiry "so long as those expenditures fall within legal limits." *Bonta,* 272 F.Supp.2d at 1104 (stating that "it seems clear that speech by the government is government speech, however funded"). Although *Bonta* correctly observed that the government is free to support its policies and programs "by taxes or other exactions binding on protesting parties," the court did not analyze the impact that such assessments could have on the First Amendment rights of dissenting citizens. *Id.* (quoting *Southworth,* 529 U.S. at 229, 120 S.Ct. 1346). In this court's view, the assessment method employed by the State is critical to the degree of intrusiveness on private speech. The imposition of a general tax that is used to fund government speech has little impact on the First Amendment rights of dissenting citizens due to the attenuated nexus between the assessment and the speech. Conversely, the direct fee assessment imposed by State in this case presents a situation in which the level of intrusion is much more significant. Although *Bonta* currently stands as the most thorough discussion of the government speech doctrine, this court departs from its analysis because it failed to consider the importance that the government's assessment method has on the First Amendment inquiry.

■ As to the State's interest in requiring abortion providers to pay for the information materials, the State contends it is facing "serious funding shortfalls," thus the expense of producing the materials is "not necessarily one which the state treasury could easily bear." *See* Defendants' Brief In Opposition to Plaintiffs' Motion for Partial Summary Judgment, p. 9. Although the State's interest in monetary savings is legitimate, it cannot overcome the First Amendment interests at stake in this case. *See Lassiter v. Dep't of Social Servs.,* 452 U.S. 18, 28, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (explaining that although the State of North Carolina's interest in pecuniary savings was legitimate, it could not overcome the Due Process rights of its citizens). In reaching this conclusion, the court emphasizes that the State's interest in requiring abortion providers to pay for the State's informa-

4. The only substantial Eleventh Circuit discussion of the government speech doctrine occurs in *NAACP v. Hunt,* 891 F.2d 1555, 1566 (11th Cir.1990). In *Hunt,* a group of citizens filed suit challenging the constitutionality of flying the Confederate flag atop Alabama's capitol dome. *Id.* at 1559. With regard to the First Amendment aspect of the suit, the court stated that "[i]t might appear problematic at first glance that the state is using the NAACP's tax dollars to raise and maintain the flag, and thus is forcing them to contribute to a cause repugnant to them." *Id.* at 1566. Nevertheless, the court dismissed this argument: *"Abood* has never been applied to the government, however; if it were, taxation would become impossible." *Id.* Although *Hunt* is certainly binding precedent on this court, it does not resolve the present case because its discussion only relates to compelled speech within the context of a general tax, not a direct fee assessment. As explained above, a direct fee assessment against a narrow class of citizens infringes on the First Amendment rights of citizens in a much stronger fashion than a generalized tax that is equally applicable to everyone.

tion is much less compelling than its interest in requiring them to distribute the information to women seeking an abortion. The latter requirement can easily be justified on the grounds that the State has a significant interest in regulating the health and welfare of its citizens. Consequently, several courts, including this one, have upheld compelled distribution provisions against First Amendment challenges. *See Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 884, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Riley*, 274 F.Supp.2d at 1283; *Karlin v. Foust*, 975 F.Supp. 1177, 1226 (W.D.Wis.1997), *aff'd in part, rev'd in part*, 188 F.3d 446 (7th Cir.1999). The calculus changes, however, when the only asserted interest justifying compelled payment is funding shortfalls.

Merging the two components of the balancing inquiry, the court concludes that the State's interest in requiring abortion providers to pay for its informational materials cannot justify the significant infringement on the Plaintiffs' First Amendment rights. Accordingly, even if the Defendants had presented the court with its government speech argument at the appropriate stage of this litigation, the court would not have altered its conclusion that the Act's compelled payment provision, section 26–23A–5(c), violates the First Amendment.

## V. *CONCLUSION AND ORDER*

For the reasons stated above, it is hereby ORDERED that the Defendants' Motion to Alter or Amend Order on Summary Judgment is DENIED.