# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

Nos. 02-2769/2832

_____

Livestock Marketing Association,   *
an association of livestock markets,   *
on behalf of themselves and others   *
similarly situated; Western Organization  *
of Resource Councils, an association of  *
grassroots organizations that seek to   *
protect natural resources, family farms,  *
and rural communities, on behalf of   *
themselves and others similarly   *
situated; Robert M. Thullner; John L.  *
Smith; Ernie J. Mertz; John Willis;   *
Pat Goggins; Herman Schumacher;   *
Jerry Goebel; Leo Zentner, on behalf  *
of themselves and others similarly   *
situated,   *
  *
  *   Appeals from the United States
     Plaintiffs-Appellees.   *   District Court for the
  *   District of South Dakota
     v.   *
  *
United States Department of Agriculture;*
Ann Veneman, Secretary of Agriculture; *
Cattlemen's Beef Promotion and   *
Research Board, an organization of   *
cattle producers and importers charged  *
with implementing the Beef Research  *
and Promotion Order,   *
  *
     Defendants-Appellants.   *

Nebraska Cattlemen, Inc.; Gary Sharp;   *
Ralph Jones,                            *
                                        *
    Intervenors-Defendants.             *

_____

Submitted:   March 10, 2003

Filed:   July 8, 2003

_____

Before LOKEN,[1] Chief Judge, and McMILLIAN and FAGG, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

The United States Department of Agriculture ("USDA"), the Secretary of the USDA ("the Secretary"), the Cattlemen's Beef Promotion and Research Board ("the Beef Board"), the Nebraska Cattlemen, Inc., Gary Sharp, and Ralph Jones (collectively "appellants") appeal from an order of the United States District Court[2] for the District of South Dakota in favor of the Livestock Marketing Association ("LMA"), the Western Organization of Resource Councils, and several individual beef producers (collectively "appellees") enjoining as unconstitutional the collection of mandatory assessments from beef producers under the Beef Promotion and Research Act of 1985, 7 U.S.C. § 2901 et seq. ("the Beef Act"), to pay for generic advertising of beef and beef products. Livestock Marketing Ass'n v. United States Dep't of Agric., 207 F. Supp. 2d 992 (D.S.D. 2002) (LMA II) (holding that the Beef Act violates the free speech clause of the First Amendment and granting permanent

_____

[1]The Honorable James B. Loken became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2003.

[2]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

prospective injunctive relief). For reversal, appellants argue that the district court erred in its analysis because the advertising conducted pursuant to the Beef Act is "government speech" and therefore immune from First Amendment scrutiny or because the Beef Act survives First Amendment scrutiny either as regulation of commercial speech or as part of a broader regulatory scheme. Appellants additionally argue that the district court abused its discretion in fashioning an overly broad injunction. For the reasons stated below, we now affirm the order of the district court.

## Jurisdiction

Jurisdiction was proper in the district court based upon 28 U.S.C. §§ 1331, 1361. Jurisdiction is proper in this court based upon 28 U.S.C. §§ 1291, 1292(a)(1). The notices of appeal were timely filed pursuant to Fed. R. App. P. 4(a).

## Background

Following the enactment of the Beef Act, the Secretary promulgated a Beef Promotion and Research Order ("the Beef Order"), which established the Beef Board and a Beef Promotion Operating Committee ("the Beef Committee"). See 7 U.S.C. §§ 2903, 2904 (directing Secretary to promulgate order and setting forth required terms of order). The Beef Order requires beef producers and beef importers to pay transaction-based assessments, as mandated by the Beef Act. See id. § 2904(8). This mandatory assessment program is commonly referred to as the "beef checkoff" program. The funds from the beef checkoff program are designated for promotion and advertising of beef and beef products, research, consumer information, and industry information. See id. § 2904(4)(B).

Under the Beef Act, the Beef Order was subject to approval by qualified beef producers through a vote by referendum. Id. § 2906(a). In 1988, the Beef Order was

put to an initial referendum vote and was approved by a majority of the participating beef producers. Thereafter, LMA began efforts to challenge the continuation of the beef checkoff program. See id. § 2906(b) ("After the initial referendum, the Secretary may conduct a referendum on the request of a representative group comprising 10 per centum or more of the number of cattle producers to determine whether cattle producers favor termination or suspension of the order."). On November 12, 1999, LMA submitted petitions to the USDA requesting a referendum on whether to terminate or suspend the Beef Order. The Secretary took no action on LMA's petitions.

On December 29, 2000, appellees filed the present lawsuit in the district court seeking: (1) declaratory judgment that the Beef Act, or the Secretary's actions or inactions pursuant thereto, violate federal law; (2) an injunction prohibiting the Secretary from continuing the beef checkoff program; (3) a preliminary injunction ordering defendants to take immediate action toward a referendum on the continuation of the beef checkoff program; and (4) an order requiring the Beef Board to cease expenditures for "producer communications" (i.e., messages designed to discourage cattle producers from supporting a referendum) and to make restitution to producers of over $10 million, representing producer communications expenditures since 1998. The district court held a hearing on January 25, 2001, and issued a preliminary injunction on February 23, 2001, enjoining defendants from further use of beef checkoff assessments to create or distribute any communications for the purpose of influencing governmental action or policy concerning the beef checkoff program. Livestock Marketing Ass'n v. United States Dep't of Agric., 132 F. Supp. 2d 817 (D.S.D. 2001) (LMA I).

On June 25, 2001, the Supreme Court held that mandatory assessments imposed on mushroom producers for the purpose of funding generic mushroom advertising under the Mushroom Promotion, Research, and Consumer Information Act of 1990, 7 U.S.C. § 6101 et seq. ("the Mushroom Act"), violated the First

Amendment. United States v. United Foods, Inc., 533 U.S. 405, 413 (2001) (United Foods) ("[T]he mandated support is contrary to the First Amendment principles set forth in cases involving expression by groups which include persons who object to the speech, but who, nevertheless, must remain members of the group by law or necessity.") (citing Abood v. Detroit Bd. of Educ., 431 U.S. 209 (1977) (Abood); Keller v. State Bar, 496 U.S. 1 (1990) (Keller)). The Supreme Court distinguished the circumstances in United Foods from those in Glickman v. Wileman Bros. & Elliott, Inc., 521 U.S. 457 (1997) (Glickman) (rejecting First Amendment challenge to mandatory agricultural assessments which paid for generic advertising of California tree fruits), decided four years earlier. The Court explained that, in Glickman, "[t]he producers of tree fruit who were compelled to contribute funds for use in cooperative advertising 'd[id] so as a part of a broader collective enterprise in which their freedom to act independently [wa]s already constrained by the regulatory scheme,'" whereas, in United Foods, "the compelled contributions for advertising [were] not part of some broader regulatory scheme" and the advertising was itself the "principal object" of the regulatory scheme. United Foods, 533 U.S. at 412, 415.

Thereafter, in the present case, the district court granted appellees leave to amend their complaint to include a First Amendment claim in light of the Supreme Court's United Foods decision. On August 3, 2001, appellees filed an amended complaint adding a claim that generic advertising conducted pursuant to the Beef Act violates their rights under the First Amendment to freedom of speech and freedom of association. The parties thereafter filed cross-motions for partial summary judgment on the First Amendment claim, and those motions were denied.

The case proceeded to a bench trial on January 14, 2002, solely to address appellees' First Amendment claim. Upon considering the evidence presented, the district court issued LMA II, setting forth its findings of facts and conclusions of law. The district court held that appellees, or at least some of them, had standing to allege that they were being compelled to support speech to which they objected, in violation

-5-

of their rights under the First Amendment.  See 207 F. Supp. 2d at 996-97. In this context, the district court found that individual plaintiffs objected to the use of their checkoff dollars to "promot[e] all cattle rather than American cattle," "to promote imported beef," "for generic advertising of beef," "for generic advertising which implies that beef is all the same," and for "messages that are contrary to [the] belief that only American beef should be promoted." Id. at 996-97.  The district court then reviewed several of the Supreme Court's pertinent First Amendment precedents, including Abood (1977), Keller (1990), Glickman (1997), and United Foods (2001). See id. at 997-1002.  In this context, the district court discussed the Supreme Court's reasoning in United Foods, distinguishing the mandatory assessments for California tree fruit advertising at issue in Glickman, which "'were ancillary to a more comprehensive program restricting marketing autonomy,'" from the mandatory assessments for mushroom advertising at issue in United Foods, which funded speech that, "'far from being ancillary, [wa]s the principal object of the regulatory scheme.'" Id. at 1000 (quoting United Foods, 533 U.S. at 411-12).

Regarding the underlying circumstances in the present case, the district court found, among other things:

> Like the plaintiffs in Abood and Keller, the plaintiff cattle producers are compelled to associate.  They are required by federal law, by virtue of their status as cattle producers who desire to sell cattle, to pay "dues," if you will, to an entity created by federal statute.
>
> . . . .
>
> The beef checkoff is, in all material respects, identical to the mushroom checkoff: producers and importers are required to pay an assessment, which assessments are used by a federally established board or council to fund speech.  Each sale of a head of cattle requires a one dollar payment as a checkoff.  Thus, the beef checkoff is more intrusive, if you will, than was the case with the mushroom checkoff.  The

-6-

evidence presented to the court in this case was that at least 50% of the assessments collected and paid to the Beef Board are used for advertising. Only 10-12% of assessments collected and paid to the Beef Board are used for research. Clearly, the principal object of the beef checkoff program is the commercial speech itself. Beef producers and sellers are not in any way regulated to the extent that the California tree fruit industry is regulated. Beef producers and sellers make all marketing decisions; beef is not marketed pursuant to some statutory scheme requiring an anti-trust exemption. The assessments are not germane to a larger regulatory purpose.

Id. at 997-98, 1002 (internal citations and quotation marks omitted). Thus, consistent with the Supreme Court's decision in United Foods, the district court concluded:

The beef checkoff is unconstitutional in violation of the First Amendment because it requires plaintiffs to pay, in part, for speech to which the plaintiffs object. The Constitution requires that expenditures for advertising of beef be financed only from assessments paid by producers who do not object to advancing the generic sale of beef and who are not coerced into doing so against their wills.

Id. at 1002.

Addressing appellants' "government speech" argument, which was essentially asserted as an affirmative defense to appellees' First Amendment claim, the district court apparently assumed that, if the generic advertising conducted pursuant to the Beef Act qualifies as government speech, then the Beef Act is immune from First Amendment scrutiny. Upon considering whether the Beef Board is "more akin to a governmental agency, representative of the people," or more "akin to a labor union or state bar association whose members are representative of one segment of the population" id. at 1004, the district court ultimately determined the latter to be true and concluded that "[t]he generic advertising funded by the beef checkoff is not government speech and is therefore not excepted from First Amendment challenge."

-7-

Id. at 1006. In reaching this conclusion, the district court relied upon <u>United States v. Frame</u>, 885 F.2d 1119 (3d Cir. 1989) (<u>Frame</u>), and disagreed with appellants' contention that <u>Lebron v. National Railroad Passenger Corp.</u>, 513 U.S. 374 (1995) (<u>Lebron</u>), conclusively supported the contrary view. The district court explained:

> <u>Lebron</u> could hardly be regarded as a "government speech" case. [The defendant] Amtrak was contending that it was not a governmental agency for the purposes of an artist's First Amendment challenge to the denial of his request to display an advertisement on an Amtrak billboard. The question in <u>Lebron</u> was not whether the speech was constitutional (because the government can use compelled contributions to pay for speech which is repugnant to some who contributed) but whether Amtrak could constitutionally prevent the artist's speech.

<u>LMA II</u>, 207 F. Supp. 2d at 1005.

The district court also rejected appellants' argument that the Beef Act survives First Amendment scrutiny as a regulation of commercial speech. In so doing, the district court declined to apply the test for commercial speech used in <u>Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n</u>, 447 U.S. 557 (1980) (<u>Central Hudson</u>). The district court noted, among other things, that "[t]he Supreme Court in <u>Glickman</u> rejected the use of the <u>Central Hudson</u> test because [<u>Central Hudson</u>] involved a restriction on commercial speech rather than the compelled funding of speech involved in the California tree fruit marketing orders." <u>LMA II</u>, 207 F. Supp. 2d at 999 (citing <u>Glickman</u>, 521 U.S. at 474 n.18).

On the issue of appropriate relief, appellants argued in the district court that the injunction should apply to only those who were plaintiffs in the case and only those expenditures that related to political or commercial speech. The district court disagreed as a practical matter, but recognized that retroactive enforcement of an injunction would result in undue hardships. Thus, the district court declared the Beef

Act and the Beef Order unconstitutional and prospectively enjoined appellants "from any further collection of beef checkoffs as of the start of business on July 15, 2002" (i.e., approximately three weeks after the date of the district court's order). Id. at 1008.

The district court certified its order, which partially disposed of the issues in the case, as a final judgment pursuant to Fed. R. Civ. P. 54(b). Appellants thereafter timely filed the present appeals. We granted appellants' motion for a stay of the district court's order pending our decision.[3] For the reasons stated below, we now affirm the order of the district court.

## Discussion

### I.

We review *de novo* the question of whether the Beef Act violates the First Amendment. See United States v. Washam, 312 F.3d 926, 929 (8th Cir. 2002) (challenge to constitutionality of federal statute reviewed *de novo*). We generally review the district court's findings of facts for clear error; however, in a case such as this involving a First Amendment claim, we will, where necessary, examine the record as a whole and "make a fresh examination of crucial facts." Hurley v. Irish-American Gay, Lesbian, & Bisexual Group, 515 U.S. 557, 567 (1995); see also Families Achieving Independence & Respect v. Nebraska Dep't of Soc. Servs., 111 F.3d 1408, 1411 (8th Cir. 1997) (en banc) ("[W]e review findings of noncritical facts for clear error. . . . We independently review the evidentiary basis of critical facts, giving due regard to the trial court's opportunity to observe the demeanor of witnesses.").

---

[3]The stay order will remain in effect until our mandate issues.

In the present case, we have independently reviewed the record and agree with the district court's findings of crucial facts. For example, we agree with the district court's finding that appellees are compelled to pay the statutorily-mandated assessments in question. See LMA II, 207 F. Supp. 2d at 997-98. Unlike fees charged for the use of recreational facilities or special taxes imposed on non-essential consumer products, the mandatory assessments at issue in the present case are directly linked to appellees' source of livelihood, and they have no meaningful opportunity to avoid these assessments. We also agree with the district court that appellees, or at least some of them, disagree with the generic advertising conducted pursuant to the Beef Act. See id. at 996-97. Finally, upon careful consideration of the record and the pertinent statutory provisions, we agree with the district court that "[t]he beef checkoff is, in all material respects, identical to the mushroom checkoff" at issue in United Foods, that "at least 50% of the assessments collected and paid to the Beef Board are used for advertising," and that "the principal object of the beef checkoff program is the commercial speech itself." Id. at 1002.

## II.

Appellants first argue that appellees' First Amendment claim is barred because the advertising conducted pursuant to the Beef Act is government speech and therefore immune from First Amendment scrutiny. The Supreme Court has never specifically addressed this government speech argument in a case involving an agricultural checkoff program. In United Foods, it was undisputed that the government speech argument had not been asserted or addressed in the court below. Therefore, the Supreme Court declined to consider whether or not the Mushroom Act was immune from First Amendment scrutiny on that basis. See United Foods, 533 U.S. at 416-17 ("As the Government admits in a forthright manner, . . . this [government speech] argument 'was not raised or addressed' in the Court of Appeals." . . . The Government's failure to raise its argument in the Court of Appeals

deprived respondent of the ability to address significant matters that might have been difficult points for the Government.").

Since the Supreme Court's United Foods decision, many district courts have addressed the government speech issue in determining the constitutionality of various agricultural checkoff programs. Compare, e.g., Charter v. United States Dep't of Agriculture, 230 F. Supp. 2d 1121 (D. Mont. 2002) (Charter) (upholding the beef checkoff program on ground that generic advertising under the Beef Act is government speech), with Pelts & Skins, L.L.C. v. Jenkins, No. CIV.A.02-CV-384, 2003 WL 1984368, at *6 (M.D. La. Apr. 24, 2003) (holding that mandatory assessments imposed to fund generic advertising of alligator products violate alligator farmer's First Amendment rights; reasoning in part: "[b]ecause the generic advertising here involved is not government speech, plaintiff is free to challenge such advertising on First Amendment grounds"); In re Washington State Apple Advertising Comm'n, 257 F. Supp. 2d 1290, 1305 (E.D. Wa. 2003) (holding that mandatory assessments imposed to fund generic advertising of Washington State apples violate apple producers' First Amendment rights; reasoning in part: "the Commission's activities are not protected by the government speech doctrine"); Michigan Pork Producers v. Campaign for Family Farms, 229 F. Supp. 2d 772, 785-89 (W. D. Mich. 2002) (holding that mandatory assessments imposed to fund generic advertising of pork and pork products violate pork producers' First Amendment rights; reasoning in part: "[t]hough the Secretary is integrally involved with the workings of the Pork Board, this involvement does not translate the advertising and marketing in question into 'government speech'"). In the present case, appellants have specifically urged us to follow the reasoning and disposition in Charter.

Appellants describe the government speech doctrine as follows:

The government is constitutionally entitled to engage in its own speech without implicating the First Amendment. As this Court has

-11-

recognized, "'[t]he First Amendment does not prohibit the government itself from speaking, nor require the government to speak. Similarly, the First Amendment does not preclude the government from exercising editorial discretion over its own medium of expression.'"

Brief for Appellants[4] at 26 (quoting Knights of the Ku Klux Klan v. Curators of the Univ. of Mo., 203 F.3d 1085, 1093-94 (8th Cir.) (Ku Klux Klan) (where underwriting acknowledgments by nonprofit public broadcast ratio station constituted governmental speech, state university operating the station could exercise editorial discretion over content of such acknowledgments without being subject to First Amendment forum analysis), cert. denied, 531 U.S. 814 (2000), (quoting Muir v. Alabama Educ. Television Comm'n, 688 F.2d 1033, 1044 (5th Cir. 1982) (en banc)).

As to the determination of whether generic advertising under the Beef Act is or is not government speech, appellants cite our decision in Ku Klux Klan for proposition that government speech may be identified based upon the central purpose of the program, the degree of editorial control exercised by the government over the content of the message, and whether the government bears the ultimate responsibility for the content of the message. In addition, appellants cite Lebron, 513 U.S. at 400, in which the Supreme Court stated that, when "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." Applying these principles to the present case, appellants contend that the generic advertising under the Beef Act is government speech. They emphasize, among other things, that the Beef Board and the Beef Committee were created pursuant to the Beef Act, members of the Beef Board and the Beef Committee serve at the direction and under the control of the Secretary, the Beef Act itself prescribes the content of the

---

[4]Citations to the "Brief for Appellants" refer to the brief filed by United States Department of Justice on behalf of the federal appellants.

Beef Board's and the Beef Committee's speech as generic promotion of beef and beef products, and the Beef Act defines the powers and duties of the Beef Board and the Beef Committee vis-a-vis those promotional activities. Moreover, they argue, the First Amendment exemption for government speech applies whether it is the government itself speaking or a private entity enlisted by the government to speak on the government's behalf. See, e.g., Legal Services Corp. v. Velazquez, 531 U.S. 533, 541 (2001).

Appellants also dispute the district court's reasoning based upon the Third Circuit's 1989 decision in Frame. In Frame, the Third Circuit emphasized that funding for advertising under the Beef Act comes from an identifiable group rather than a general tax fund and reasoned that this type of funding creates a "coerced nexus" between the message and the group. However, appellants argue, such reasoning based upon a "coerced nexus" has been rejected by the Supreme Court in cases such as Board of Regents v. Southworth, 529 U.S. 217, 229 (2000) (Southworth) (in evaluating a First Amendment compelled speech claim based upon the use of mandatory student activity fees to fund private organizations engaging in political or ideological speech, holding that "the University of Wisconsin may sustain the extracurricular dimensions of its programs by using mandatory student fees with viewpoint neutrality as the operational principle").

III.

We begin our analysis by examining the so-called "government speech doctrine" at a fundamental level. The government speech doctrine has firm roots in our system of jurisprudence. As the Supreme Court has explained:

> Government officials are expected as a part of the democratic process to represent and to espouse the views of a majority of their constituents. With countless advocates outside of the government

-13-

seeking to influence its policy, it would be ironic if those charged with making governmental decisions were not free to speak for themselves in the process.  If every citizen were to have a right to insist that no one paid by public funds express a view with which he [or she] disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed.

Keller, 496 U.S. at 12-13 (citing United States v. Lee, 455 U.S. 252, 260 (1982) (religious belief in conflict with payment of taxes affords no basis under the free exercise clause for avoiding uniform tax obligation)).

However, the government speech doctrine clearly does not provide immunity for all types of First Amendment claims.  Cf. Santa Fe Sch. Dist. v. Doe, 530 U.S. 290, 302-10 (2000) (student-led prayers delivered prior to home football games at a public high school constituted public speech attributable to the school district and thus violated the establishment clause of the First Amendment), cited in Charter, 230 F. Supp. 2d at 1134-36.  Nor do the cases cited by appellants hold that, when the government speaks, it is entirely immune from all types of First Amendment free speech claims.  Our decision in Ku Klux Klan, for example, upheld a discretionary decision by a state university-run radio station to decline an offer of an underwriting donation because the university did not wish to publicly acknowledge the source of the offered donation, as was required by law.  That case stands for the proposition – embodied in the language from Keller quoted above – that, when the government speaks in its role as the government, it may be immune from First Amendment challenge based upon its choice of content.  Cf. Rust v. Sullivan, 500 U.S. 173, 192-95 (1991) (the government may, without violating the First Amendment, selectively fund speech that is believed to be in the public interest, while at the same time restricting funding for speech that promotes an alternate viewpoint).  Indeed, as appellants themselves argue: "Because the First Amendment limits government interference with private speech rather than the Government's own speech, 'when the

-14-

State is the speaker, it may make content-based choices . . . [and] it is entitled to say what it wishes.'"  Brief for Appellants at 26 (quoting <u>Rosenberger v. Rector & Visitors of the University of Virginia</u>, 515 U.S. 819, 833 (1995)).

Appellants have inadvertently identified the precise flaw in their government speech argument.  Unlike in <u>Ku Klux Klan</u>, where the plaintiffs challenged a decision concerning the content of government speech, appellees in the present case are challenging the government's authority to compel them to support speech with which they personally disagree; such compulsion is a form of "government interference with private speech."  The two categories of First Amendment cases – government speech cases and compelled speech cases – are fundamentally different.  <u>See, e.g.</u>, <u>Southworth</u>, 529 U.S. at 234-35 (in addressing a First Amendment compelled speech claim based upon the use of mandatory student activity fees to fund private organizations engaging in political or ideological speech, the Supreme Court noted that "the analysis likely would be altogether different" if the matter concerned speech by the University).[5]

---

[5]Similarly, appellants' reliance on <u>Lebron v. National Railroad Passenger Corp.</u>, 513 U.S. 374 (1995) (<u>Lebron</u>), is misplaced.  <u>Lebron</u> involved an artist's First Amendment claim against the entity commonly known as Amtrak, challenging Amtrak's refusal to allow him to lease billboard space for political advertising.  The issue before the Supreme Court was whether Amtrak was a private corporation or part of the government for purposes of determining its exposure to a constitutional challenge.  <u>Id.</u> at 379.  Amtrak argued that it was *not* part of the government and therefore not subject to the constitutional challenge.  By contrast, in a government speech case, the defendant typically argues that it *is* part of the government and therefore immune from content-related First Amendment scrutiny of its own speech under the government speech doctrine.  Moreover, even if the Beef Board and the Beef Committee were deemed to be parts of the government under the <u>Lebron</u> standard and the speech in question was therefore deemed to be government speech, our First Amendment inquiry would not end there.  <u>See</u> infra at 19-20 & n.9.

-15-

In the present case, appellees have not invoked the First Amendment to influence the content of the generic beef advertising at issue. Rather, they assert their First Amendment free speech and free association rights to protect themselves from being compelled to pay for that speech, with which they disagree. Their First Amendment claim predominantly raises a free speech issue,[6] and our analysis is generally governed by the Supreme Court's compelled speech line of cases, including Keller and Abood. See United Foods, 533 U.S. at 413 ("It is true that the party who protests the assessment here is required simply to support speech by others, not to utter the speech itself. We conclude, however, that the mandated support is contrary to the First Amendment principles set forth in cases involving expression by groups which include persons who object to the speech, but who, nevertheless, must remain members of the group by law or necessity.") (citing Keller and Abood). As suggested by Justice Stevens in his concurring opinion in United Foods, 533 U.S. at 417-18, cases such as Keller, Abood, and the case at bar – involving compelled payment of money – may be viewed as the "compelled subsidy" subset of the compelled speech cases.

In compelled speech cases, the Supreme Court has traditionally applied a balancing-of-interests test to determine whether or not the challenged governmental action is justified. See, e.g., Keller, 496 U.S. at 13 ("[T]he compelled association and integrated bar are justified by the State's interest in regulating the legal profession and improving the quality of legal services."); Wooley v. Maynard, 430 U.S. 705, 715-16 (1977) (Wooley) ("Identifying the [appellees'] interests as implicating First Amendment protections does not end our inquiry however. We must also determine

---

[6]As indicated in Abood v. Detroit Bd. of Ed., 431 U.S. 209, 222-23, 233-36 (1977), if appellees' First Amendment claim challenged only the fact that they are being compelled to contribute to a collective fund, their claim would implicate only their free association right. However, because appellees are additionally challenging the use of those funds to pay for disfavored speech, their claim predominantly implicates their free speech right.

-16-

whether the State's countervailing interest is sufficiently compelling to justify requiring appellees to [convey the message to which they object]."). In the present case, we must decide what constitutional standard applies when compelled subsidies are used to fund generic commercial advertising. On this question, appellants have consistently argued that, even if the Beef Act is not immune from First Amendment scrutiny under the government speech doctrine, it nevertheless survives First Amendment scrutiny as regulation of commercial speech under the Central Hudson standard.

We are again faced with an issue that was not directly addressed by the Supreme Court in United Foods. In United Foods, 533 U.S. at 409-10 (internal citations omitted), the Supreme Court stated:

> We have used standards for determining the validity of speech regulations which accord less protection to commercial speech than to other expression. That approach, in turn, has been subject to some criticism. We need not enter into the controversy, for even viewing commercial speech as entitled to lesser protection, we find no basis under either Glickman or our other precedents to sustain the compelled assessments sought in this case. It should be noted, moreover, that the Government itself does not rely upon Central Hudson to challenge the Court of Appeals' decision, and we therefore do not consider whether the Government's interest could be considered substantial for purposes of the Central Hudson test.

In the present case, as stated above, the district court declined to apply the Central Hudson test to appellees' First Amendment claim, noting that the Supreme Court had declined to apply that test in Glickman. See LMA II, 207 F. Supp. 2d at 999 ("The Supreme Court in Glickman rejected the use of the Central Hudson test because [Central Hudson] involved a restriction on commercial speech rather than the compelled funding of speech involved in the California tree fruit marketing orders.") (citing Glickman, 521 U.S. at 474 n.18). However, we disagree with the district

-17-

court's reasoning because it fails to account for the more recent pronouncements in United Foods. In United Foods, the Supreme Court went out of its way to distinguish the broad cooperative scheme that comprehensively regulated the California tree fruit industry at issue in Glickman from the comparatively unregulated, and more commercially competitive, mushroom industry. The Court also emphasized that collective advertising was the "principal object" of the Mushroom Act, United Foods, 533 U.S. at 415, whereas the collective advertising in Glickman was just one among many of the "anticompetitive features of the [California tree fruit] marketing orders," Glickman, 521 U.S. at 470. Accordingly, we conclude that Glickman does not provide a complete answer to this commercial speech issue. We infer that, had the government relied upon Central Hudson in United Foods, the Supreme Court would have adapted the Central Hudson test to the circumstances of that case, but would nevertheless have held that the Mushroom Act unconstitutionally regulated commercial speech. Such an inference, we believe, is consistent with the language from United Foods quoted above. We reach this conclusion recognizing that Central Hudson involved a restriction on speech[7] while the present case involves compelled speech. In our view, it is more significant that Central Hudson and the case at bar both involve government interference with private speech in a commercial context. Accordingly, because the beef checkoff program at issue in the present case is identical in all material respects to the mushroom checkoff program at issue in United Foods, we now adapt the Central Hudson test to appellees' First Amendment claim.

In Central Hudson, 447 U.S. at 566, the Supreme Court explained:

---

[7]In Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557, 570-71 (1980), the Supreme Court held that a regulation promulgated by the New York Public Service Commission, which completely banned promotional advertising by a utility company, violated the company's First Amendment free speech right because it was more extensive than necessary to further the State's governmental interest in energy conservation.

-18-

At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

In adapting the Central Hudson test to the particular circumstances of this case, we ask not whether the expression at issue is protected but rather whether appellees have a protected interest in avoiding being compelled to pay for the expression at issue (the generic beef advertising). We have already answered that question; under the compelled speech line of cases, appellees have a protected First Amendment interest at stake. The remaining questions are whether the governmental interest in the beef checkoff program is substantial and, if so, whether the beef checkoff program directly advances that governmental interest and is not more extensive than necessary to serve that interest. Stated more succinctly, the issue is whether the governmental interest in the commercial advertising under the Beef Act[8] is sufficiently substantial to justify the infringement upon appellees' First Amendment right not to be compelled to subsidize that commercial speech.

At this juncture, we may now revisit appellants' government speech arguments, to put them into proper perspective. Appellants' government speech arguments are relevant to our assessment of the substantiality of the government's interest.[9] As a

_____

[8]Appellants describe the governmental interest as "protecting the welfare of the beef industry." Brief for Appellants at 51.

[9]As we have already explained, a determination that the expression at issue is government speech does not preclude First Amendment scrutiny in the compelled speech context. For example, in Wooley v. Maynard, 430 U.S. 705, 715-16 (1977), the issue was whether New Hampshire motorists could be compelled to convey a

general proposition, the greater the government's responsibility for, and control over, the speech in question, the greater the government's interest therein. In this sense, we do take into account the quasi-governmental nature of the Beef Board and the Beef Committee and the oversight, albeit limited, exercised by the Secretary over the generic advertising conducted pursuant to the Beef Act. However, consistent with the district court's conclusion that the advertising in question is not government speech, we consider the substantiality of the government's interest to be highly doubtful. In any event, even assuming that the government's interest is substantial, our First Amendment inquiry does not end there. We must determine whether the government's interest is sufficiently substantial to justify the infringement upon appellees' First Amendment rights. At this point, the analysis turns largely upon the nature of the speech in question. See, e.g., Central Hudson, 447 U.S. at 563 (constitutional protection available turns on both the nature of the governmental interest served by the regulation and the nature of the expression).

In Keller and Abood, the Supreme Court considered the nature of the speech at issue in terms of whether or not it was *germane* to the institutional purposes which justified the mandatory dues in the first place. In Keller, 496 U.S. at 13-14, the Court explained:

> Abood held that a union could not expend a dissenting individual's dues for ideological activities not "germane" to the purpose for which compelled association was justified: collective bargaining. Here the compelled association and integrated bar are justified by the

message with which some of them disagreed, by having it displayed on their state-issued license plates. The message was clearly "government speech" in the sense that it came directly from the state, yet it was ultimately held to violate the First Amendment. See id. at 717 ("[W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh the individual's First Amendment right to avoid becoming the courier for such message.").

-20-

State's interest in regulating the legal profession and improving the quality of legal services. The State Bar may therefore constitutionally fund activities germane to those goals out of the mandatory dues of all members. It may not, however, in such manner fund activities of an ideological nature which fall outside of those areas of activity.

More recently, in Southworth, 529 U.S. at 232-35, the Supreme Court determined that the germaneness standard was "unmanageable" in the context of a state university, "particularly where the State undertakes to stimulate the whole universe of speech and ideas." Thus, the Court held in that particular case that "[t]he proper measure, and the principal standard of protection for objecting students . . . is the requirement of viewpoint neutrality in the allocation of funding support." Id. at 233. The Court explained:

> Viewpoint neutrality is the justification for requiring the student to pay the fee in the first instance and for ensuring the integrity of the program's operation once the funds have been collected. We conclude that the University of Wisconsin may sustain the extracurricular dimensions of its programs by using mandatory student fees with viewpoint neutrality as the operational principle.

Id. at 233-34. As observed above, the Court also alluded to the government speech doctrine in Southworth by stating:

> Our decision ought not to be taken to imply that in other instances the University, its agents or employees, or–of particular importance–its faculty, are subject to the First Amendment analysis which controls in this case. Where the University speaks, either in its own name through its regents or officers, or in myriad other ways through its diverse faculties, the analysis likely would be altogether different. *The Court has not held, or suggested, that when the government speaks the rules we have discussed come into play.*

Id. at 234-35 (emphasis added) (internal citations omitted).

The Supreme Court has repeatedly warned that, when assessing the nature of the speech in the compelled speech context – whether based upon germaneness, viewpoint neutrality, or some other benchmark – the analysis often comes down to a difficult line-drawing exercise. See Keller, 496 U.S. at 15 ("Precisely where the line falls between those State Bar activities in which the officials and members of the Bar are acting essentially as professional advisers to those ultimately charged with the regulation of the legal profession, on the one hand, and those activities having political or ideological coloration which are not reasonably related to the advancement of such goals, on the other, will not always be easy to discern."); Abood, 431 U.S. at 236 ("There will, of course, be difficult problems in drawing lines between collective-bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited."). In the case at bar, however, we need not, ourselves, engage in such a line-drawing exercise. The Supreme Court has already drawn the relevant line for us. In United Foods, the Supreme Court explained:

> The statutory mechanism as it relates to handlers of mushroom is concededly different from the scheme in Glickman; here the statute does not require group action, save to generate the very speech to which some handlers object. In contrast to the program upheld in Glickman, where the Government argued the compelled contributions for advertising were "part of a far broader regulatory system that does not principally concern speech," there is no broader regulatory system in place here. We have not upheld compelled subsidies for speech in the context of a program where the principal object is speech itself. Although greater regulation of the mushroom market might have been implemented, . . . the compelled contributions for advertising are not part of some broader regulatory scheme. The only program the Government contends the compelled contributions serve is the very advertising scheme in question. Were it sufficient to say speech is germane to itself, the limits observed in Abood and Keller would be empty of meaning and significance. The cooperative marketing structure relied upon by a majority of the Court in Glickman to sustain an ancillary assessment

finds no corollary here; the expression respondent is required to support is not germane to a purpose related to an association independent from the speech itself; and the rationale of <u>Abood</u> extends to the party who objects to the compelled support for this speech.

533 U.S. at 415-16 (internal citation omitted); <u>see also</u> <u>id.</u> at 418 (Stevens, J., concurring) ("As we held in <u>Glickman</u>, <u>Keller</u>, and a number of other cases, such a compelled subsidy is permissible when it is ancillary, or 'germane,' to a valid cooperative endeavor. The incremental impact on the liberty of a person who has already surrendered far greater liberty to the collective entity (either voluntarily or as a result of permissible compulsion) does not, in my judgment, raise a significant constitutional issue if it is ancillary to the main purpose of the collective program. This case, however, raises the open question whether such compulsion is constitutional when nothing more than commercial advertising is at stake. The naked imposition of such compulsion, like a naked restraint on speech itself, seems quite different to me. We need not decide whether other interests . . . might justify a compelled subsidy like this, but surely the interest in making one entrepreneur finance advertising for the benefit of his [or her] competitors, including some who are not required to contribute, is insufficient.") (internal footnote omitted).

This court is duty-bound to reconcile and apply the precedents of the Supreme Court to the best of our ability. The beef checkoff program is, in all material respects, identical to the mushroom checkoff program at issue in <u>United Foods</u>. <u>See</u> 207 F. Supp. 2d at 1002. Therefore, notwithstanding the reasoned counterpoints advanced by the dissent in <u>United Foods</u>, <u>see</u> 405 U.S. at 419-31 (Breyer, J., dissenting), we conclude that the government's interest in protecting the welfare of the beef industry by compelling all beef producers and importers to pay for generic beef advertising is not sufficiently substantial to justify the infringement on appellees' First Amendment free speech right. Accordingly, the district court did not err in holding that the Beef Act and the Beef Order are unconstitutional and unenforceable.

IV.

Having carefully reviewed the arguments asserted by the parties concerning the scope of the injunction imposed by the district court, we further hold that the district court did not abuse its discretion in fashioning its relief. Our holding that the Beef Act is unconstitutional is not limited solely to the plaintiffs in the present case. See, e.g., United Foods, 533 U.S. at 416 (holding that "the assessments are not permitted under the First Amendment"). We also reject the suggestion that a portion of the assessments may continue to be collected because some of the funds are spent on activities other than commercial or political speech. When the Beef Act was amended in 1985, Congress specifically deleted a pre-existing severability provision. The legislative history of that deletion is described as follows:

**Separability of Provisions**

Section 19 of Pub.L. 94-294, which provided that if any provision of this Act [enacting this chapter and provisions set out as notes under this section] or the application thereof to any person or circumstances is held invalid, the validity of the remainder of the Act and of the application of such provision to other persons and circumstances shall not be affected thereby, *was omitted* in the general revision of sections 2 through 20 of Pub.L. 94-294 by Pub.L. 99-198, Title XVI, § 1601(b), Dec. 28, 1985, 99 Stat. 1597.

7 U.S.C.A. § 2901 (West 1985) (Historical and Statutory Notes) (emphasis added). In view of this clear expression of non-severability and the fact that the "principal object" of the Beef Act is the very part that makes it unconstitutional (i.e., compelled funding of generic advertising), no remaining aspects of the Act can survive.

**Conclusion**

For the reasons set forth above, the order of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.