**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**April 2, 2004**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-30523

_____

PELTS & SKINS, LLC,

Plaintiff-Appellee,

versus

WILLIAM DWIGHT LANDRENEAU, Secretary for the Department of
Wildlife and Fisheries,

Defendant-Appellant.

--------------------
Appeal from the United States District Court
for the Middle District of Louisiana, Baton Rouge
--------------------

Before KING, Chief Judge, and BENAVIDES and CLEMENT, Circuit
Judges.

BENAVIDES, Circuit Judge:

Plaintiff-Appellee Pelts & Skins farms alligators in
Louisiana. Defendant-Appellant William Dwight Landreneau is
Secretary of the Louisiana Department of Wildlife and Fisheries
("DWF"), the agency responsible for overseeing conservation of
alligators.[1] Louisiana requires alligator hunters and farmers to
pay various fees, and DWF uses a portion of those fees to support
generic marketing of alligator products. Pelts & Skins alleges

_____

[1] Mr. Landreneau replaced James A. Jenkins as secretary after the district
court ruled. To avoid confusion, we refer to Mr. Landreneau as the Secretary.

that this practice constitutes a compelled subsidy for private speech that violates the First Amendment. The district court agreed with Pelts & Skins and permanently enjoined use of the fees to support generic marketing of alligator products.

We conclude that Pelts & Skins lacks standing to challenge the use of certain alligator-related fees. With regard to the fees Pelts & Skins does have standing to challenge, we agree with the district court that the use of those fees for generic marketing violates the First Amendment. We therefore affirm in part, vacate in part, and remand in part.

## I.

The American alligator was once endangered, but Louisiana law now allows the hunting and farming of alligators for their meat and skins. DWF regulates the hunting, farming, processing, and shipment of alligators and alligator parts. *See* La. Rev. Stat. Ann. § 36:602(B) (West Supp. 2004). DWF does not regulate the prices or marketing of alligators, but it does administer two funds, the proceeds of which support generic marketing of alligator products: the Louisiana Fur and Alligator Public Education and Marketing Fund (the "Marketing Fund") and the Louisiana Alligator Resource Fund (the "Resource Fund"). The generic marketing supported by these two funds is the focus of this case.[2]

---

[2] This type of scheme--compelled subsidies for generic marketing--has produced many familiar campaigns, including "Got Milk?"; "Pork: The Other White Meat"; "The Incredible, Edible Egg"; "Ah . . . the Power of Cheese"; and "The Touch . . . the Feel of Cotton . . .the Fabric of Our Lives." *See Cochran v.*

2

The Marketing Fund derives its revenues from license fees, i.e., the fees associated with the hunting licenses that fur trappers and alligator hunters must carry. *See id.* §§ 56:251(A), 56:266(D). Twenty dollars of every twenty-five-dollar license fee are earmarked for the Marketing Fund.[3] *Id.* The Louisiana Legislature created the Marketing Fund to market alligator and fur products, to educate the public about the harvesting of those products, and to recommend strategies to the fur and alligator industry. *Id.* § 56:266(B).

The Resource Fund derives its revenues from a variety of fees imposed on alligator hunters, farmers, and processors. *Id.* § 56:279. The most notable of these fees is the tag fee, a charge for the tag that must be attached to every harvested alligator skin. *Id.* § 56:253(C).[4] The Legislature created the Resource Fund "to help defray the cost of alligator programs" administered by DWF. *Id.* § 56:279(A). The Resource Fund supports alligator-related research and, when surplus funds are available, helps to

---

*Veneman*, 359 F.3d 263, 266 (3d Cir. 2004); *Mich. Pork Producers Ass'n v. Veneman*, 348 F.3d 157, 162 & n.2 (6th Cir. 2003), *petition for cert. filed sub. nom. Veneman v. Campaign for Family Farms*, 72 U.S.L.W. 3539 (U.S. Jan. 20, 2004) (No. 03-1043).

[3] The state treasurer may apply collected fees to the Marketing Fund and the Resource Fund only after she ensures that state revenues can cover due and payable state debts. La. Rev. Stat. Ann. §§ 266(D)(1), 279(C)(1) (West Supp. 2004). The record does not indicate that the treasurer has ever applied alligator-related fees to state debts.

[4] Section 56:253(C)(2)(a) allows DWF to charge up to four dollars per tag, and during some years, Pelts & Skins paid four dollars per tag. But starting in September 2002, DWF temporarily suspended the collection of two dollars of the regular four-dollar fee. La. Admin. Code tit. 76, § 701(A)(4)(a)(xi) (2003).

3

fund alligator-related law enforcement and marketing programs. *Id.* § 56:279(B).

DWF monitors both funds, and the Secretary must approve all expenditures for generic marketing, but another state-created entity, the Louisiana Fur and Alligator Advisory Council (the "Council"), is directly responsible for the content of the generic marketing and must review and approve all expenditures from the funds. *Id.* §§ 266(C), 279(D)(3). The Council comprises the Secretary (or his designate), who serves ex officio, and eleven appointed members. *Id.* § 56:266(C). The speaker of the House and the president of the Senate each appoint one member. *Id.* The Secretary appoints nine members, and those nine members must represent "a cross-section of trappers, alligator hunters, coastal landowners, and alligator farmers." *Id.* Two of those nine members must represent a private organization, the Louisiana Alligator Farmers and Ranchers Association. *Id.* The Secretary may appoint the remaining seven members based on nominations from the Louisiana Trappers and Alligator Hunters Association. *Id.*

Pelts & Skins, as Louisiana's (and the world's) largest alligator farming operation, pays fees that account for roughly 25% of the alligator-related revenues received by DWF. Pelts & Skins does not object to the collection of these revenues but does object to the expenditure of these funds on generic marketing. According to Pelts & Skins, its business depends on convincing consumers that

4

it produces a unique product that is superior in quality to other alligator products. Generic alligator marketing undercuts this message because generic marketing does not differentiate between particular types, qualities, or brands of alligator products, but rather promotes the notion that alligator products in general are desirable, reliably available, and lawfully produced.[5] Pelts & Skins also hints broadly that the Council's generic marketing campaign, which consists mainly of sending representatives to fashion shows and setting up educational displays, is a boondoggle. However, Pelts & Skins is quick to clarify that its objection to generic marketing stems from the message of that marketing, not its efficacy.

Based on its objection to the generic marketing's content, Pelts & Skins sought to enjoin DWF from expending revenues from the Marketing Fund and the Resource Fund for generic alligator marketing. According to Pelts & Skins, Louisiana violated the First Amendment by imposing mandatory fees on Pelts & Skins, then using those fees to subsidize a message with which Pelts & Skins disagrees. In response, the Secretary argued (1) that the Tax Injunction Act of 1937 barred federal jurisdiction; (2) that the

---

[5] Pelts & Skins' objection to the message embodied in generic marketing may seem minor, but the Supreme Court has explained that the perceived importance of a plaintiff's objection is immaterial. *See United States v. United Foods*, 533 U.S. 405, 411 (2001) ("First Amendment values are at serious risk if the government can compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side that it favors; and there is no apparent principle which distinguishes out of hand minor debates about whether a branded mushroom is better than just any mushroom.").

generic marketing at issue was government speech not subject to First Amendment scrutiny; and (3) that, in the alternative, the generic marketing was merely ancillary to a broader cooperative regime and therefore consistent with the First Amendment.

The parties agreed to submit the case on the record without live testimony. The district court determined (1) that the Tax Injunction Act did not bar federal jurisdiction; (2) that the generic marketing was not government speech; and (3) that the use of mandatory fees to fund generic marketing was not ancillary to a broader cooperative regime. *Pelts & Skins, L.L.C. v. Jenkins*, 259 F. Supp. 2d 482 (M.D. La. 2003). The court permanently enjoined the Secretary from "approving, authorizing or expending any revenue from the Louisiana Fur and Alligator Public Education and Marketing Fund or from the Louisiana Alligator Resource Fund for the purpose of generic alligator marketing." *Id.* at 494. The Secretary appealed.[6]

## II.

We first address the Secretary's contention that Pelts & Skins lacks standing to challenge expenditures from the Marketing Fund. The Secretary failed to raise this argument in the district court, but a party may raise standing at any time, even on appeal. *Johnson v. City of Dallas*, 61 F.3d 442, 443-44 (5th Cir. 1995).

---

[6] The Secretary has appealed neither the district court's findings of fact nor its ultimate holding with regard to the Tax Injunction Act.

The first requirement of standing is that a party must demonstrate an injury in fact. *See McConnell v. FEC*, 124 S. Ct. 619, 707 (2003). Pelts & Skins alleges that it has been injured in fact because it must pay fees that directly support a message with which it disagrees. The Secretary claims that Pelts & Skins has failed to prove this injury with regard to the Marketing Fund. The Secretary concedes that Pelts & Skins has paid the tag fees that support the Resource Fund, and the record amply supports that concession.[7] However, according to the Secretary, Pelts & Skins has not shown that it has ever paid the license fees that support the Marketing Fund.

We agree with the Secretary that Pelts & Skins failed to prove that Louisiana's use of the marketing fund has caused an injury in fact. Because this case proceeded to final judgment,[8] "the factual allegations supporting standing (if controverted)[9] must be

---

[7] We must address standing on a claim-by-claim basis, so Pelts & Skins cannot parlay its standing to challenge the Resource Fund into standing to challenge the Marketing Fund. *See James v. City of Dallas*, 254 F.3d 551, 563 (5th Cir. 2001).

[8] As noted above, the parties agreed to let the hearing on Pelts & Skins' motion for summary judgment serve as a submission of the case on the merits. The district court treated the case as a trial on a stipulated record. *See Pelts & Skins*, 259 F. Supp. 2d at 483. At oral argument, Pelts & Skins claimed that it did not realize that the trial court would go beyond addressing the motion for summary judgment. However, even had this case been resolved on summary judgment, Pelts & Skins could not have rested on mere allegations, but would have had to set forth specific facts by affidavit or other evidence. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

[9] This parenthetical does not mean that Pelts & Skins did not need to support its allegations with evidence because the Secretary failed to controvert those allegations in the district court. Were we to interpret *Walker* in this way, we would undermine the established rule that objections to standing may not be waived. *See Lang v. French*, 154 F.3d 217, 222 n.28 (5th Cir. 1998); *In re Weaver*, 632 F.2d 46, 463 n.6 (5th Cir. 1980).

7

supported adequately by the evidence adduced at trial." *Walker v. City of Mesquite*, 169 F.3d 973, 978 (5th Cir. 1999); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Pelts & Skins must support each element of standing just as it would support any other matter on which it bears the burden of proof. *Lewis v. Casey*, 518 U.S. 343, 358 (1996).

Pelts & Skins has not carried this burden. Nowhere does the record indicate that Pelts & Skins ever held a hunting license or paid any fee that supports the Marketing Fund. Instead, Pelts & Skins relies on assertions in pleadings. Had the district court decided this case on a motion to dismiss, these allegations would be sufficient; however, once a case passes this preliminary stage, a plaintiff must set forth evidence of an injury in fact. *See Lujan*, 504 U.S. at 561 (1992); *Walker*, 169 F.3d at 978 & n.15.[10] The record contains no such evidence.

Pelts & Skins also relies on the district court's finding that "plaintiff's farming operation is conditioned upon payment of mandatory fees ('license fees' and 'tag fees') to the DWF." 259 F. Supp. 2d at 483-84. We review for clear error the findings underlying a district court's determination of standing. *Rivera v.*

---

[10] Pelts & Skins also relies on a sentence from the Secretary's Answer in which the Secretary "admit[s] . . . that plaintiff does contribute to the fund." Answer ¶ 24. However, this so-called admission is ambiguous; the Secretary's statement does not specify which of the two funds Pelts & Skins has contributed to. Because this statement is less than "deliberate, clear, and unequivocal," it cannot serve as a judicial admission. *See Heritage Bank v. Redcom Labs., Inc.*, 250 F.3d 319, 329 (5th Cir. 2001).

*Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002); *Pederson v. La. State Univ.*, 213 F.3d 858, 869 (5th Cir. 2000). A finding is clearly erroneous if a review of the evidence leaves us with a firm conviction that the district court has made a mistake. *Dickerson ex rel. Dickerson v. United States*, 280 F.3d 470, 474 (5th Cir. 2002). The absence of any evidence supporting the district court's finding firmly convinces us that, based on the record as it stands, the district court has made a mistake. *Cf. Walker v. U.S. Dep't of Hous. & Urban Dev.*, 99 F.3d 761, 770 (5th Cir. 1996).[11] Given the parties' failure to contest and to address standing in the district court, the district court's finding is unsurprising; nevertheless, that finding is clearly erroneous on this record.

On this record, therefore, Pelts & Skins lacks standing to challenge expenditures from the Marketing Fund. A district court may only remedy the injury in fact the plaintiff has established. *Lewis*, 518 U.S. at 357 (1996). We therefore vacate the portion of the injunction concerning the Marketing Fund.

When jurisdiction is not clear from the record but could exist, we may remand to the district court so that the parties may supplement the record. *Mollett v. Penrod Drilling Co.*, 872 F.2d

---

[11] The Secretary also argues that the relevant statutes provide that only a natural person, not a corporate entity such as Pelts & Skins, can hold a hunting license. Because the district court can consider these arguments on remand, we need not discuss them except to say that neither the governing statutes, *see* La. Rev. Stat. Ann. § 56:8, 56:54 (West Supp. 2004), nor the governing regulations, *see* La. Admin. Code tit. 76, § 701 (2003), affirmatively support the district court's finding that Pelts & Skins must pay a hunting license fee to operate its business.

1221, 1228 (5th Cir. 1989). Remand is especially appropriate when, as in this case, jurisdiction may hinge on a simple factual matter that was left untested because the parties did not dispute standing in the district court. After further review, the district court may determine that Pelts & Skins has paid the license fee. We therefore remand this case in part. On remand, the district court should ascertain whether Pelts & Skins has standing to challenge the Marketing Fund and modify the injunction accordingly.

## III.

Although Pelts & Skins lacks standing to challenge use of the Marketing Fund, it has standing to challenge use of the Resource Fund. We therefore consider whether the use of the Resource Fund to promote generic alligator marketing violates the First Amendment. We review the district court's resolution of this constitutional question *de novo*. *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 295 F.3d 471, 482 (5th Cir. 2002).

## A.

We first consider whether the generic alligator marketing is government speech or private speech. The government speech doctrine holds that "when the government appropriates public funds to promote a particular policy of its own, it is entitled to say what it wishes." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). The Secretary argues that generic

10

alligator marketing is immune from First Amendment review because the State of Louisiana is speaking.[12]

We disagree. Not all government-facilitated speech is government speech. The government speech doctrine does not apply if a program is "designed to facilitate private speech, not to promote a governmental message." *Velazquez*, 531 U.S. at 542. In this case, three considerations--the method by which DWF funds generic marketing, the composition and operation of the Fur and Alligator Advisory Council, and an application of the policies underlying the government speech doctrine--convince us that the generic marketing at issue is not government speech, but government facilitation of the private speech of fur and alligator harvesters.[13]

---

[12] The Supreme Court has not determined how the government speech doctrine applies to compelled subsidies for generic marketing. Neither of the two Supreme Court cases addressing mandatory assessments for generic marketing considers the question of government speech. *See United States v. United Foods, Inc.*, 533 U.S. 405 (2001); *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457 (1997). In *United Foods*, the Court intimated that the government speech doctrine might have been applicable to the issue of compelled assessments for generic marketing but expressly reserved this question because the argument was not raised or addressed in the court of appeals. 533 U.S. at 416-17.

Rather, courts usually consider the government speech doctrine when plaintiffs challenge restrictions on government-funded expression as content- or viewpoint-discriminatory. *See, e.g.*, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 536-37 (2001) (striking down restrictions that barred government-funded lawyers from challenging the validity of welfare statutes); *Rosenberger*, 515 U.S. at 822-28 (striking down state university's restrictions on use of student activities funds for religious publications); *Rust v. Sullivan*, 500 U.S. 173, 177-83 (1991) (upholding restriction that barred recipients of federal funds from discussing abortion as a method of family planning).

[13] Three other circuits addressed the application of the government speech doctrine to programs similar to the generic alligator marketing program and uniformly concluded that this type of producer-funded generic marketing is not government speech.

The Third and Sixth Circuits relied upon two basic considerations: first, that assessments on producers rather than general revenues funded the marketing;

11

First, the method by which DWF funds generic alligator marketing suggests that generic alligator advertising is the message of fur and alligator harvesters, not Louisiana as a whole. Government speech is typically funded from a government's general revenues, not assessments levied on a particular group. *See Keller*, 496 U.S. at 11; *Mich. Pork*, 348 F.3d at 162; *Frame*, 885 F.2d at 1132-33. The portions of the Resource Fund administered by the Council do not come from general state revenues; rather, they come from fees levied on only one group: harvesters of furs and alligators. The Resource Fund remains in an account segregated from the State's general revenues. La. Rev. Stat. Ann. § 56:279(C)(1) (West Supp. 2004). Moreover, the expenditures recommended, reviewed, and approved by the Council primarily concern precisely those persons who must contribute to the Resource Fund. This "close nexus" between the individuals who pay for the

and second, that the organizations responsible for the content of the generic marketing represented private rather than governmental interests. *See Cochran*, 359 F.3d at 273-74 (generic milk marketing); *Mich. Pork*, 348 F.3d at 161-62 (generic pork marketing); *United States v. Frame*, 885 F.2d 1119, 1131-33 (3d Cir. 1989) (generic beef marketing).

The Eighth Circuit declared the government speech doctrine categorically inapplicable to compelled subsidy cases. *See Livestock Mktg. Ass'n v. U.S. Dep't of Agric.*, 335 F.3d 711, 720 (8th Cir. 2003), *petition for cert. filed sub. nom. Veneman v. Livestock Mktg. Ass'n*, 72 U.S.L.W. 3539 (U.S. Feb. 13, 2004) (No. 03-1164). The Supreme Court's treatment of compelled subsidy challenges convinces us that the government speech doctrine is at least potentially applicable to this general category of cases. In *Keller v. State Bar*, the Court invoked the government speech doctrine and analyzed whether an integrated state bar was a government agency before turning to the question of whether bar dues constituted an impermissible compelled subsidy for private speech. 496 U.S. 1, 10-13 (1990). In *Board of Regents of University of Wisconsin System v. Southworth*, the Court considered a compelled subsidy challenge to mandatory student fees and stated in dictum that, had the state university not denied that the speech at issue was government speech, "the analysis likely would be altogether different." 529 U.S. 217, 235 (2000).

12

speech and the content of the speech suggests that Louisiana is facilitating a private message, not expressing its own. *See Frame*, 885 F.2d at 1132.

Second, an organization that represents private interests, the Council, is primarily responsible for the generic marketing campaign. *Cochran*, *Michigan Pork*, and *Frame* all dealt with generic marketing programs run by industry-specific councils. In each of these cases, the federal agriculture secretary appointed the members of the council based on nominations from industry representatives. Because these councils were composed of industry representatives, the courts determined that those councils, though appointed by the government, represented private interests. *See Cochran*, 359 F.3d at 274; *Michigan Pork*, 348 F.3d at 162; *Frame*, 885 F.3d at 1133.

Likewise, although the Council is a government creation, the composition of the Council demonstrates that it represents primarily private interests.[14] The Secretary or his designate serves on the Council ex officio, and he and other government

---

[14] The Secretary argues that alligator marketing is government speech because the Council's governing statutes lay out specific goals and articulate Louisiana's interest in promotion of the alligator industry. *See* La. Rev. Stat. Ann. §§ 56:266(B), 56:279(A) (West Supp. 2004). The fact that the government has an interest in facilitating private speech does not convert that speech into a governmental message. The federal government laid out similar interests in the statutes at issue in *Michigan Pork*, *Livestock Marketing*, and *Frame*, but none of those courts considered the articulation of those interests relevant. *See Mich. Pork*, 348 F.3d at 159; *Livestock Mktg.*, 335 F.3d at 713-14; *Frame*, 885 F.2d at 1122-23. Moreover, in *Velazquez*, the Court held that the legal representation at issue was not government speech despite the fact that Congress had articulated a governmental interest in funding legal representation for indigent litigants. 531 U.S. at 536, 541-42.

13

officials appoint all the remaining members of the Council, but the Secretary does not enjoy plenary discretion to appoint any person to the Council. La. Rev. Stat. Ann. § 56:266(C) (West Supp. 2004). Rather, he must appoint a carefully calibrated "cross section of trappers, alligator hunters, coastal landowners, and alligator farmers." *Id.* Two members of the Council must represent a private organization, the Louisiana Farmers and Ranchers Association. *Id.* The Secretary may choose all nine of the Council members he appoints based on nominations from private organizations, *id.*, and the record suggests that the Secretary does so. Because representatives of private alligator harvesters compose the heavy majority of the Council, it naturally reflects private rather than governmental interests.[15]

Furthermore, although the Secretary portrays alligator marketing as a DWF-run program, the Council, not DWF, primarily controls how the Resource Fund is used.[16] *Cf. Michigan Pork*, 348

---

[15] In *Lebron v. National Railroad Passenger Corp.*, the Supreme Court considered whether Amtrak was "an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution." 513 U.S. 374, 394 (1995). *Lebron*, however, involved an issue very different from the question presented in this case. In *Lebron*, an artist sued to compel Amtrak to display political artwork on an Amtrak-owned billboard. *Id.* at 376-78. The question was not whether Amtrak's use of the billboard was government speech; like a privately-owned billboard, the Amtrak billboard was designed to facilitate promotion of private messages. *Id.* Rather, the question in *Lebron* was whether the First Amendment placed any limitations on Amtrak's use of the billboard. *Id.* We thus consider *Lebron* inapplicable to the issue at hand. *Accord Cochran*, 359 F.3d at 274 n.10; *Livestock Mktg.*, 335 F.3d at 720 n.5.

[16] To be sure, DWF could exercise limited control over the Council. Aside from his appointment power, the Secretary also retains the power to veto the Council's expenditures from the Resource Fund. *See* La. Rev. Stat. Ann. §

14

F.3d at 162. DWF cannot spend money from the Resource Fund without the Council's approval. La. Rev. Stat. Ann. § 56:279(D)(3) (West Supp. 2004). Moreover, the record suggests that DWF's approval of contracts recommended by the Council is largely perfunctory. *Cf. United Foods*, 533 U.S. at 416-17 (suggesting in dictum that evidence of *pro forma* oversight implies that government-facilitated generic marketing is not government speech). Our review of the record reveals no evidence that DWF crafts or edits the content of any of the generic marketing at issue; rather, this task falls to private contractors hired by the Council to market alligator products. Thus, the Council, not DWF, is primarily responsible for generic alligator marketing.

Third, the policies underlying the government speech doctrine do not support the application of that doctrine to this case. One rationale for the government speech doctrine is that, without the doctrine, "every citizen [would] have a right to insist that no one paid by public funds express a view with which he disagreed . . . and the process of government as we know it would be radically transformed." *Keller*, 496 U.S. at 12-13. This case, however, does not raise the specter of lawsuit-induced paralysis. As our discussion of standing demonstrates, only members of the narrow

56:279(D) (West Supp. 2004). The record, however, contains no evidence that the Secretary has ever exercised that veto.

15

group compelled to contribute funds to subsidize directly a private message have standing to challenge the expression at issue.

A second rationale for the government speech doctrine is that "[w]hen the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy." *Velazquez*, 531 U.S. at 541 (quoting *Southworth*, 529 U.S. at 235). In contrast, the government can easily avoid accountability when it imposes costs on a single, narrow group to facilitate a specialized message, especially if only a small minority of that group objects to the message expressed.

We are not dealing with a program funded from general revenues by broadly applicable taxes. Nor are we dealing with a governmental message crafted, controlled, and expressed by an agency designed to represent state government. Rather, in this case we confront a program in which the government uses its authority to exact fees from private individuals, then facilitates the use of those fees to express a message designed to benefit private commercial interests. This sort of program is not government speech.

### B.

Because we have determined that use of the Resource Fund for generic marketing represents a compelled subsidy for private speech, we must decide whether that compulsion is nonetheless

16

permissible. The Supreme Court has twice addressed compelled subsidies for generic marketing. In *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457 (1997), the Court upheld compelled subsidies for generic fruit marketing. In *United States v. United Foods, Inc.*, 533 U.S. 405 (2001), the Court struck down compelled subsidies for generic mushroom marketing. We must mediate between these two contrasting precedents, or, in the words of the district court, "determine whether Louisiana alligator producers are more like mushroom producers than like peach producers." *Pelts & Skins*, 259 F. Supp. 2d at 483.

In *Glickman*, the Court evaluated a New Deal-era regulatory scheme that required producers of peaches, plums, and nectarines to participate in "[c]ollective, rather than competitive, marketing." 521 U.S. at 461. This collective marketing scheme "displaced competition" by imposing uniform prices, dictating the quality and quantity of the fruits marketed, determining the grade and size of the fruits sold, providing for the orderly disposition of surplus, authorizing joint research and development projects, requiring standardized packaging, and even exempting affected producers from antitrust laws. *Id.* As part of this displacement of competition, the government required producers to pay for generic marketing of the fruit. *Id.* A group of growers alleged that the assessments violated the First Amendment. The Court upheld the assessments only after "stress[ing] the importance of the statutory context."

17

*Id.* at 469. Because the growers were part of a "broader collective enterprise in which their freedom to act independently [was] already constrained by the regulatory scheme," the Court characterized the assessments for generic marketing as "a species of economic regulation that should enjoy the same strong presumption of validity that we accord to other policy judgments made by Congress." *Id.* at 477.

Later, in *United Foods*, mushroom handlers refused to pay mandatory assessments to fund generic mushroom marketing. 533 U.S. at 408-09. The Court struck down the assessments as violations of the handlers' First Amendment right not to subsidize speech with which they disagreed. *Id.* at 409. Unlike the program in *Glickman*, the Court reasoned, the mushroom program was not "ancillary to a more comprehensive program restricting marketing autonomy." *Id.* at 411. Rather, the generic mushroom advertising, "far from being ancillary, [was] the principal object of the regulatory scheme." *Id.* at 411-12. The Court summarized its compelled subsidy cases and enunciated a guiding principle: When the government binds individuals into a collective association, the government can also require that those persons subsidize speech germane to the purpose underlying the association. *United Foods*, 533 U.S. at 413-15; *see also Keller*, 496 U.S. at 13-14 (integrated bar); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 235-36 (1977) (closed union shop). Because the mushroom program did not require association except to

18

support generic marketing, the program violated the First Amendment. *United Foods*, 533 U.S. at 415-16.

We agree with the district court that Louisiana's generic alligator marketing program more closely resembles the mushroom program at issue in *United Foods* than the fruit program at issue in *Glickman*. The *Glickman* rule permitting compelled subsidies applies when individuals have been "bound together" in a collective. *United Foods*, 533 U.S. at 412; *accord Cochran*, 359 F.3d at 275; *Delano Farms Co. v. Cal. Table Grape Comm'n*, 318 F.3d 895, 898-99 (9th Cir. 2003) (striking down compelled subsidies for generic grape marketing). Without an underlying collectivized association, a state cannot justify a compelled subsidy. *See United Foods*, 533 U.S. at 413-15. Louisiana alligator producers are not part of a collective association akin to *Glickman*'s marketing cooperative. None of the laws governing alligator production imposes collective rather than competitive marketing as the scheme in *Glickman* did. *Cf. Cochran*, 359 F.3d at 275. Rather, as the Secretary admits, the State of Louisiana does not regulate prices in the alligator market, and alligator harvesters are free to negotiate prices and to market products as they wish.[17]

---

[17] *Abood* and *Keller* allow compelled subsidies for speech that is germane to a lawfully compelled collective association. *Abood*, 431 U.S. at 235-36; *Keller*, 496 U.S. at 14. In this case there is no underlying association to which the generic marketing could be germane. Therefore, we need not determine whether generic marketing is germane to Louisiana's other alligator-related regulations.

The Secretary emphasizes Louisiana's extensive regulation of alligator harvesting and argues that generic alligator marketing, like generic peach marketing, is permissible because it is ancillary to Louisiana's alligator regulations.[18] Regulations alone do not create compelled association. *See Cochran*, 359 F.3d at 275; *Delano Farms*, 318 F.3d at 899. In *Glickman*, the fruit producers were subject to a specific type of regulation: a scheme that displaced individual marketing efforts and thus necessitated collective generic marketing. *See* 521 U.S. at 461. Likewise, in *Keller* and *Abood*, the state required that individuals join a collective interest group; to be effective, that interest group had to speak on behalf of its members on certain issues. *See Keller*, 496 U.S. at 14-15; *Abood*, 431 U.S. at 220-23. A number of interdependent state, federal, and international laws impose requirements on alligator harvesters, but these laws do not require collective association, and "it is only the overriding *associational* purpose which allows compelled subsidy for speech in the first place." *United Foods*, 533 U.S. at 413 (emphasis added).[19]

---

[18] The Secretary also seeks to distinguish *United Foods* and its progeny by pointing out that those cases involved privately-owned commodities, whereas alligators are the property of the State of Louisiana. La. Civ. Code Ann. art. 3413 (West 1994). However, this case does not involve the marketing of live wild alligators, but the marketing of products made from lawfully captured and enclosed alligators, which are private property. *See id.* arts. 3413, 3415.

[19] In *Glickman*, the Court identified three ways in which the regulatory scheme at issue was different from laws found to abridge the First Amendment: (1) the assessments did not bar producers from communicating their own messages; (2) the assessments did not compel the producers to engage in any actual or symbolic speech; and (3) the assessments did not compel endorsement of any political or ideological views. 521 U.S. at 469. The Secretary urges us to consider these

We recognize that, unlike the assessments at issue in *United Foods*, *Cochran*, and *Delano Farms*, a majority of the alligator-related assessments fund programs other than generic marketing. *See United Foods*, 533 U.S. at 411-12, 415; *Cochran*, 359 F.3d at 276; *Delano Farms*, 318 F.3d at 899. In each of the past several years, the Council has spent approximately 15% of the Resource Fund on generic marketing and the remainder on research and law enforcement. This distinction in the percentage of fees that go to generic marketing does not support applying *Glickman* to this case. The key element of *Glickman*--a highly collectivized marketing association--is still absent. The common thread uniting *Abood*, *Keller*, *Glickman*, and *United Foods* is that compelled subsidization of speech is permissible when individuals have been bound into a collective association. *United Foods*, 533 U.S. at 413-15. The fees imposed here, though used for more than generic marketing, represent a collective association only in the loosest sense of that term.[20]

---

factors. However, "[t]hese points were noted in *Glickman* in the context of a different type of regulatory scheme and are not controlling of the outcome." *United Foods*, 533 U.S. at 411. The Court in *United Foods* was especially careful to emphasize that the non-political, non-ideological nature of the generic marketing was irrelevant. *Id*. at 410-11. Because the compelled subsidies in this case are materially distinct from the collective marketing scheme at issue in *Glickman*, these three factors are irrelevant to this case.

[20] The Secretary observed at oral argument that, in other compelled subsidy cases, courts have struck down entire marketing programs and invalidated the collection of assessments. *E.g.*, *United Foods*, 533 U.S. at 408-09; *Cochran*, 359 F.3d at 280; *Mich. Pork*, 348 F.3d at 159; *Livestock Mktg.*, 335 F.3d at 713; *Delano Farms*, 318 F.3d at 897. In contrast, Pelts & Skins does not seek to stop paying alligator-related fees, but instead challenges only the use of those fees.

21

In sum, Louisiana's alligator regulations are more analogous to the mushroom marketing program in *United Foods* than to the fruit marketing collective in *Glickman*. The use of mandatory fees for generic marketing is not ancillary to a government-imposed collective association. Louisiana's use of the Resource Fund to support generic marketing therefore violates the First Amendment.[21]

## IV.

As the record stands, Pelts & Skins has not proven that it has standing to challenge use of the Marketing Fund. Therefore, we

---

The Secretary argues that the limited nature of this challenge proves that generic marketing is concomitant to other programs supported by the Resource Fund. Although generic marketing might be one of a number of alligator-related programs, it is not ancillary to any associational regulatory scheme, much less the type of marketing collective at issue in *Glickman*.

[21] The Secretary contends that, even if the alligator marketing program burdens First Amendment rights, that program survives constitutional review under the test for restrictions on non-misleading commercial speech enunciated in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 566 (1980).

United Foods did not explain if or how the *Central Hudson* test applies to compelled subsidy cases, *see* 533 U.S. at 410, and other circuits have diverged on this question, *compare Mich. Pork*, 348 F.3d at 163 (refusing to apply *Central Hudson* test to compelled subsidy for generic pork marketing), *with Livestock Mktg.*, 335 F.3d at 722-726 (adapting *Central Hudson* test to compelled subsidy for generic beef marketing).

We doubt that the *Central Hudson* test applies. *See Glickman*, 521 U.S. at 474 n.18 (questioning in dictum "why the *Central Hudson* test, which involved a restriction on commercial speech, should govern a case involving the compelled funding of speech"). Like the Third Circuit, however, we choose to leave this question open because even were we to apply the *Central Hudson* test, Louisiana's alligator marketing program would not pass it. *See Cochran*, 359 F.3d at 277-80. To pass this test, a restriction on commercial speech must directly advance a substantial government interest and burden First Amendment rights no more than necessary to accomplish that interest. *Central Hudson*, 447 U.S. at 566. Even granting *arguendo* that Louisiana has a substantial interest in conservation and that the message expressed by the Council's generic marketing helps advance that interest, Louisiana's program burdens First Amendment speech more than necessary. Louisiana does not need to compel alligator harvesters to support generic marketing, but could simply fund generic marketing from its general tax revenues.

22

vacate the portion of the injunction barring Louisiana from using the Marketing Fund to support generic alligator marketing and remand so that the district court may determine whether Pelts & Skins has standing and modify the injunction accordingly.

With regard to the remaining challenge, we conclude that Louisiana's use of the Resource Fund to support generic marketing violates the First Amendment. We therefore affirm the district court's judgment granting a permanent injunction against use of the Resource Fund for generic alligator marketing.

AFFIRMED in part, VACATED in part, and REMANDED in part.